MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
PATRICK J. COUGHLIN (111070)
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
        – and –
WILLIAM S. LERACH (68581)
DARREN J. ROBBINS (168593)
401 B Street, Suite 1700
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

LAW OFFICES OF MARC S. HENZEL
MARC S. HENZEL
273 Montgomery Avenue, Suite 202
Bala Cynwyd, PA  19004
Telephone:  610/660-8000
610/660-8080 (fax)

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JERRY MILLER, On Behalf of Himself and All Others Similarly Situated, ) | No. |
| ) | |
| Plaintiff, ) | CLASS ACTION |
| ) | |
| vs. ) | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| ) | |
| LEAPFROG ENTERPRISES, INC., TIMOTHY M. BENDER, JAMES P. CURLEY, MARK B. FLOWERS, THOMAS J. KALINSKE, ROBERT W. LALLY, JAMES L. MARGGRAFF, PAUL A. RIOUX and MICHAEL C. WOOD, ) | |
| ) | |
| Defendants. ) | DEMAND FOR JURY TRIAL |

**SUMMARY AND OVERVIEW**

1.    This is a securities class action on behalf of all persons who purchased the common stock of LeapFrog Enterprises, Inc. ("LeapFrog" or the "Company") between August 20, 2003 and October 21, 2003 (the "Class Period"), against LeapFrog and certain of its officers and directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.    LeapFrog is a designer, developer and marketer of technology-based educational products and related proprietary content, which are marketed both through retail outlets as educational "toys" and to schools as learning devices.

3.    LeapFrog's biggest retail product is its family of LeapPad products which are hand-held and lap-top electronic platforms that are sold with a variety of content books that utilize game and entertainment technologies to teach reading, writing and math skills.  Having successfully cornered its niche market of electronic educational toys which had been largely abandoned by the other major toy companies, by 2003 LeapFrog was the third largest overall U.S. toy manufacturer, only behind industry leaders Hasbro and Mattel.  Mattel's Fisher Price launched its own version of the LeapPad on July 10, 2003, called "PowerTouch," which mimicked LeapPad and was designed to capture LeapFrog's market monopoly, utilizing Mattel's superior marketing abilities.

4.    On July 24, 2003, defendants stated LeapFrog was increasing its FY'03 second-half guidance based on favorable FY'03 first-half results and that it was preparing for a large pre-Christmas build-up by retailers, projecting FY'03 sales and operating income of $225-$235 million and $54-$57 million, respectively.  Defendants also stated LeapFrog would report net income of $0.55 to $0.58 per share and a gross profit margin of 52%-53% of sales throughout the end of 2003.

5.    Also in response to the Mattel PowerTouch roll-out, on or before August 20, 2003, defendants met with several research analysts, including Jennifer L. Childe of Bear Stearns, which had served as one of the Company's underwriters in its July 2002 initial public offering.  Defendants

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 1 -

reassured Bear Stearns that LeapFrog's 3Q'03 and 4Q'03 would still be a blow out because of its strong partnerships with key retailers. In fact, defendants told Bear Stearns that LeapFrog's top retailers, including Walmart, K-Mart, Target and Toys-R-Us, were all increasing LeapFrog's shelf space by 40% in August and that the retailers would not do this if the LeapPads were not selling. Defendants assured Bear Stearns that LeapFrog's products were continuing to sell very well in the stores and that it was their position that Mattel's entry into the electronic educational toy market had a positive impact by elevating consumer awareness and drawing in more customers. Defendants were adamant that LeapFrog's marketing strategy would not change in any way in response to Mattel's blitz. Defendants downplayed to Bear Stearns their large product inventory, stating it was needed to stock the 40% increase in retail shelf space. In connection with that meeting with LeapFrog's management, Bear Stearns published a report on August 20, 2003 entitled "Takeaways from Upbeat Meeting with Management," which contained a $0.61 per share earnings projection by Bear Stearns for 3Q'03.

6. On August 24, 2003, Lauren Rich Fine of Merrill Lynch, another one of LeapFrog's IPO underwriters, reported she too had met with LeapFrog management and that the Company's 3Q'03 financial results were "reasonably assured in terms of growth due to the need to sell in and fill the increased shelf space."

7. Again, on September 17, 2003, two weeks before the end of the Company's 3Q'03, LeapFrog's CEO and its Chairman both appeared at a ThinkEquity Partners Growth Conference in San Francisco, still maintaining that the Company's sales growth and gross profit margin were "very consistent" and that its two new products had shipped in August and were "selling well." Defendants also stated that LeapFrog's sales were traditionally seasonal, with 80% being completed in the 3Q and 4Q, and that accounts receivables would be very high in the 3Q'03 because there were "lots of sales" in the that quarter. Defendants reiterated that Mattel's entry into the market would increase

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 2 -

competition but would also increase the size of the market, and emphasized that the Company's shelf-space at its largest retailers was 40% larger and had not been "negatively impacted" by Mattel's inroads, confirming that retailers believed LeapFrog's sales would justify the additional shelf space. LeapFrog's Chairman also stated that while the entire toy industry's sales were down 3.5%, retail sales of LeapFrog's products were up 30%.

8. Based on the Company's repeated bullish statements, throughout the Class Period Bear Stearns and the Company's other analysts continually reiterated the $0.61 per share earnings guidance and the other guidance provided by LeapFrog. These projections were not disputed by LeapFrog and were based in large part on LeapFrog's own 3Q'03 sales projections of $225-$235 million, its projected gross profit margin of 52%-53%, and it's projected operating income of $54-$57 million, which were also being reiterated.

9. These projections, coupled with the Company's bullish statements, sent the Company's shares soaring to a Class Period high of over $47 per share on October 21, 2003, from $34 per share on August 20, 2003, *or a 35% increase*.

10. The true facts which were then known by each of the defendants, but concealed from the investing public during the Class Period, were that:

(a) Throughout 3Q'03, retailers were not placing the level of orders defendants expected as part of the typical pre-Christmas inventory build-up;

(b) Retailers were also refusing to allow LeapFrog to ship some of the orders they did place during 3Q'03, instead requiring LeapFrog to bear the risk of holding the product into the Christmas selling season in the 4Q'03 to see if the new products gained customer acceptance and to see how well they competed against Mattel's PowerTouch;

(c) Defendants were not replenishing LeapFrog's own inventory throughout the Class Period or making expenditures in anticipation of their projected sales; and

(d)    Defendants knew during the Class Period that Mattel's launch of PowerTouch had severely damaged LeapFrog and diminished its market share, causing the Company to file an action seeking injunctive relief against Mattel on October 6, 2003 (one week after the close of LeapFrog's 3Q'03 but more than two weeks before its 3Q'03 results would be released), claiming LeapFrog would be "irreparably injured" unless the court stopped Mattel from selling its PowerTouch.

11.    After the close of the market on October 21, 2003, with more than $18 million of insider trading proceeds in their pockets, the defendants released the Company's 3Q'03 financial results which fell materially short of their earlier projections. Knowing investors would punish the stock, trading was halted before the press release was issued. LeapFrog reported actual sales of $204 million, about 11% below the Company's own guidance of $225-$235 million. The Company's earnings were $0.55 per share instead of $0.61 per share as analysts had projected based on the Company's sales guidance. LeapFrog also missed its own projected gross profit margin of 52%-53%, coming in at only 51.4% and missed its own operating income target of $54-$57 million, coming in at only $52.6 million.

12.    During the conference call held on October 22, 2003, defendants attempted to explain away the decline in sales to retailers and to dispel any concerns that it was related to competition with PowerTouch, stating that "there's a conscious effort this year by some of the major retailers to defer their inventory buildup." But this was not true, Hasbro, which sold to the same retailers, had announced its results a week earlier and had beat expectations.

13.    When questioned about the rather large stock sales by Company insiders during the weeks previous to their announcement, both after the end of 3Q'03 on September 30, 2003 and in the weeks immediately preceding the end of the quarter, when insiders had to know the expected orders had not come in and were not being shipped to the extent they had come in, LeapFrog's CEO defended his own Class Period stock sales by claiming they were prearranged pursuant to a 10(b)5-1

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 4 -

plan and offered no explanation for the other insider's sales.  When asked why the Company did not give accurate mid-quarter 3Q'03 guidance, or even release results at the end of the quarter three weeks earlier, the CEO responded that defendants had considered it but "decided not to."  Analysts also questioned the veracity of defendants' story that expected orders just did not come in before the end of the quarter based on the fact that both LeapFrog's inventory and expenses were now down at the end of the quarter, signaling that despite their claims that they fully expected to receive and fill additional orders during the quarter, defendants had not acquired the inventory to do so nor made the necessary expenditures.

14.    On this news and the loss of LeapFrog's credibility, analysts downgraded the Company's stock and decreased their projections for 4Q'03, stating they were now skeptical of the Company's ability to make up the lost sales in the 4Q'03.  The Company's shares plunged by almost one-third to $35 from $47.30, marking a market cap loss of more than $711 million in a single trading session on heavy volume.

### JURISDICTION AND VENUE

15.    Jurisdiction is conferred by §27 of the 1934 Act.  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5.

16.    (a)    Venue is proper in this District pursuant to §27 of the 1934 Act.  Many of the false and misleading statements were made in or issued from this District.

(b)    The Company's principal executive offices are in Emeryville, California, where the day-to-day operations of the Company are directed and managed.

### THE PARTIES

17.    Plaintiff Jerry Miller purchased LeapFrog common stock as described in the attached certification and was damaged thereby.

18.    Defendant LeapFrog is a designer, developer and marketer of technology-based educational products and related proprietary content, which are marketed both in retail stores and to schools.  As of August 1, 2003, LeapFrog had 26.3 million shares of Class A common stock which are traded on the New York Stock Exchange and 31.6 million shares of Class B common stock which are privately held.

19.    Defendant Thomas J. Kalinske ("Kalinske") was the Chairman of the Board and a director of LeapFrog and President of Knowledge Universe, LeapFrog's parent corporation.  During the Class Period, Kalinske sold almost $2 million worth of his LeapFrog stock.

20.    Defendant Michael C. Wood ("Wood") was the Vice Chairman, President and Chief Executive Officer of LeapFrog.  During the Class Period, Wood sold more than $9 million worth of his LeapFrog stock.

21.    Defendant Paul A. Rioux ("Rioux") was Vice Chairman of the Board and a director of LeapFrog.  During the Class Period, Rioux sold more than $2.3 million worth of his LeapFrog stock.

22.    Defendant James P. Curley ("Curley") was Chief Financial Officer of LeapFrog.  During the Class Period, Curley sold $373,750 worth of his LeapFrog stock.

23.    Defendant James L. Marggraff ("Marggraff") was the Executive Vice President of Content of LeapFrog.  During the Class Period, Marggraff sold $695,080 worth of his LeapFrog stock.

24.    Defendant Mark B. Flowers ("Flowers") was the Executive Vice President, Chief Technology Officer of LeapFrog.  During the Class Period, Flowers sold more than $1.1 million worth of his LeapFrog stock.

25. Defendant Robert W. Lally ("Lally") was the Executive Vice President, Education and Training Group and President, SchoolHouse Division of LeapFrog. During the Class Period, Lally sold more than $1 million worth of his LeapFrog stock.

26. Defendant Timothy M. Bender ("Bender") was President, Worldwide Consumer Group of LeapFrog. During the Class Period, Bender sold more than $1.6 million worth of his LeapFrog stock.

27. The individuals named as defendants in ¶¶19-26 are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of LeapFrog's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Defendants received daily information on the status of LeapFrog's sales. Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein at ¶41, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants. Moreover, when defendants sold their LeapFrog stock, they had a duty to disclose adverse information that was not publicly available.

### SCIENTER

28. In addition to the above-described involvement, each Individual Defendant had knowledge of LeapFrog's problems and was motivated to conceal such problems. Curley, as CFO,

was responsible for financial reporting and communications with the market. Many of the internal reports showing LeapFrog's forecasted and actual growth were prepared by the finance department under Curley's direction. Defendants Wood, as CEO, Kalinske as Chairman, and Rioux as Vice Chairman, were responsible for the financial results and press releases issued by the Company. Each Individual Defendant sought to demonstrate that he could lead the Company successfully and generate the growth expected by the market.

29. Each of the officer defendants who sold LeapFrog stock during the Class Period was aware of material non-public information which was not disclosed in connection with those sales.

### FRAUDULENT SCHEME AND COURSE OF BUSINESS

30. Each defendant is liable for (i) making false statements, *or* (ii) failing to disclose adverse facts known to him about LeapFrog in connection with his stock sales. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of LeapFrog common stock was a success, as it (i) deceived the investing public regarding LeapFrog's prospects and business; (ii) artificially inflated the prices of LeapFrog's common stock; (iii) allowed defendants to arrange to sell and actually sell in excess of $18 million worth of LeapFrog shares at artificially inflated prices while in possession of material non-public information; and (iv) caused plaintiff and other members of the Class to purchase LeapFrog common stock at inflated prices.

### BACKGROUND

31. LeapFrog is a designer, developer and marketer of technology-based educational products and related proprietary content, which are marketed both in retail stores and to schools.

32. LeapFrog's biggest retail product is its family of LeapPad products which are hand-held or lap-held electronic platform devices which are marketed with a variety of content books that use a game and entertainment technology to teach reading, writing and math skills. For the past couple of years as LeapFrog built-up its business, it enjoyed a near monopoly on the educational

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 8 -

retail electronic toy market, as other big name toy companies had basically abandoned the educational toy industry.  As a result, by 2003 LeapFrog was the third largest toy manufacturer, only behind Hasbro and Mattel.

33.    In February 2003, Mattel unveiled its PowerTouch at the 100th Annual American International Toy Fair in New York.  On July 10, 2003, Mattel released the PowerTouch platform and began a massive marketing campaign.

34.    On July 24, 2003, LeapFrog released its 2Q'03 financial results and gave the following guidance for the 3rd and 4th quarters of 2003:

> We are reaffirming our third and fourth quarter guidance.  Note that the guidance for the third and fourth quarters is unchanged from that published in our fourth quarter press release on February 10th.  So to reiterate it, it's as follows: ***third quarter 2003 net sales in a range from 225 to 235 million.***  Operating income, a range of 54 to 57 million.  And diluted net income per share, a range of 55 to 58 cents.  Fourth quarter 2003, net sales 277 to 297 million.
>
> Operating income, 66 million to 71 million. And diluted net income per share of 68 cents to 74 cents.  Now, for the full year, as we have exceeded expectations in the second quarter, our full-year guidance should be revised as follows: net sales for the full year will be in a range of 647 to 683 million. Gross profit margin, 52 to 53% of net sales.  Operating expenses, a range of 37 to 38% of sales.  Our effective tax rate is 37%.  Net income, we estimate 71 to 76 million.  And our fully diluted share count is 60.6 million shares, and this results in a diluted net income per share for the full year of $1.17 to $1.25.

**DEFENDANTS' FALSE AND MISLEADING
STATEMENTS ISSUED DURING THE CLASS PERIOD**

35.    In response to the Mattel PowerTouch roll-out, on or about August 20, 2003, halfway through LeapFrog's 3Q'03, defendants met with several research analysts at the investment banks which had conducted LeapFrog's July 2002 IPO, including Jennifer L. Childe of Bear Stearns.  In an effort to get Bear Stearns to issue a positive (but false) report, defendants reassured Bear Stearns that that LeapFrog's 3Q'03 and 4Q'03 would still be a blow out because it had strong partnerships with certain key retailers.  In fact, defendants told Bear Stearns that it's top retailers, including Walmart, K-Mart, Target and Toys-R-Us were increasing LeapFrog's shelf space by 40% by the end of August.  Defendants assured Bear Stearns that LeapFrog's products were continuing to sell very well

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                    - 9 -

and that Mattel's entry into the electronic educational toy market would only have a positive impact by elevating consumer awareness and drawing in more customers. In fact, defendants stated that LeapFrog's marketing strategy would not change in any way in response to Mattel's blitz. Defendants downplayed to Bear Stearns the size of the Company's then larger inventory, stating it was needed to stock the 40% increase in shelf space. As defendants had planned, in connection with that meeting with management, Bear Stearns published a report on August 20, 2003 entitled "Takeaways from Upbeat Meeting with Management," which reiterated defendants' statements and projected 3Q'03 EPS of $0.61 earnings per share and reiterated defendants' 3Q'03 sales, operating income and gross profit margin projections.

36.    On September 17, 2003, two weeks before the end of LeapFrog's 3Q'03, defendants Curley and Kalinske presented at the ThinkEquity Partners Growth Conference in San Francisco, California, stating in relevant part:

> [CURLEY:]  I'd like to demonstrate that we're also a financially disciplined company.  You may say, well, how do you get financial discipline in a creative, innovative environment?  And I think you have to approach the product innovation with the strong ROI mentality, and that's what we try to do.  Here we have consistent sales growth over the last three years, compound annual growth of 82 %.  The first half of this year a 43%, so it's been consistently growing.  Can we go to the next slide?
>
> *Even better than the sales growth, I think, is the gross profit margin growth because that means each of the incremental sales is even more profitable. It's just coincidental that we're up 420 basis points in the last, in 2002 we actually were at 51.2% gross profit margin.  And this year we're at 52.8 in the first half of this year. So, we've continued it*.
>
> *            *            *
>
> *Our operating income has grown, really, over the last two years*.  We went public off the 2001 numbers because the middle of 2002 that we went public, we were very seasonal as a company.  We did 80% of our sales, historically, in the second half. We typically lose money in the first half of the year.
>
> So, when we went public in 2002, the only profitable numbers we had to look back on was 2001.  So, that's the numbers we went off on, so we were glad to outperform in 2002.  *We raised our operating income 335% and our net income went up 349% to $33.4 million*.
>
> *            *            *

Accounts receivable and inventory is where we put most of our cash. Accounts receivable will peak at the end of the year because we've got the Christmas receipts in, and that all gets converted to cash in the first quarter of the year. It also will be very high in the third quarter because we ship into the retailers in the third quarter, so we get a good portion of sales in the third quarter. But the fourth quarter is the biggest.

*        *        *

I would think we're factoring in a more competitive landscape instead of our primary product, you know, we're taking on first head-on competition this year. We think it's going to be a bigger market because they're going to bring more market size to it, but it's also going to be a more competitive market.

*        *        *

[UNIDENTIFIED PARTICIPANT:] Has the announcement with your competitors (inaudible) presumably time to kind of take you head-on (inaudible) and that is happening to your sort of shelf space and to major retailers. How have the major retailers responded to those announcements?

[KALINSKE:] Well, you know, that - because it's Fisher-Price Mattel, the major retails have to carry the products. They really have no choice. But, at the same point, we're getting – we've gotten our 40% shelf space increase this fall with the top five retailers over a year ago fall. ***So it hasn't negatively impacted us***. It probably has negatively impacted somebody, but it hasn't negatively impacted us in terms of shelf space.

*        *        *

[UNIDENTIFIED PARTICIPANT:] last year and?

[KALINSKE:] Well, you know, it's hard for us to answer that alone. We know that through the last published reports from all the retailers showed – you know, these are – these are varied (ph) news, you know, through the end of July – showed the total toy industry down 3.5%. The same published data showed [our] sell through up close to 30%. So ***we're obviously performing better than the industry. We're also performing better than our significant competitors***.

We believe the retailers expect us to continue to perform better than the industry and our significant competitors through the Christmas season and that's factored into our numbers and their numbers with us.

37.    By September 17, 2003, the price of LeapFrog's stock had risen on defendants' bullish statements to over $39 per share and between August 20, 2003 and September 17, 2003, defendants sold over $7.4 million worth of LeapFrog stock at artificially inflated prices without disclosing the material adverse news they knew, as follows:

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 11 -

| Date | Name | Shares Sold | Price Sold At | Proceeds |
|---|---|---|---|---|
| 08/25/03 | Lally, Robert W. | 6,250 | $34.38 | $214,875 |
| 08/27/03 | Marggraff, L. James | 2,000 | $34.63 | $69,260 |
| 08/27/03 | Wood, Michael C. | 28,964 | $36.28 | $1,050,814 |
| 09/02/03 | Curley, James P. | 5,000 | $36.75 | $183,750 |
| 09/02/03 | Flowers, Mark B. | 15,000 | $37.09 | $556,350 |
| 09/02/03 | Lally, Robert W. | 6,250 | $37.09 | $231,813 |
| 09/02/03 | Rioux, Paul A. | 15,000 | $37.09 | $556,350 |
| 09/02/03 | Kalinske, Thomas J. | 25,000 | $36.55 | $913,750 |
| 09/03/03 | Wood, Michael C. | 29,846 | $38.99 | $1,163,696 |
| 09/03/03 | Marggraff, L. James | 2,000 | $38.99 | $77,980 |
| 09/03/03 | Wood, Michael C. | 21,407 | $38.99 | $834,659 |
| 09/08/03 | Lally, Robert W. | 6,250 | $37.32 | $233,252 |
| 09/15/03 | Lally, Robert W. | 2,500 | $36.37 | $90,920 |
| 09/17/03 | Marggraff, L. James | 2,000 | $38.97 | $77,940 |
| 09/17/03 | Wood, Michael C. | 29,647 | $38.93 | $1,154,158 |

38.    However, by this time defendants knew that the major retailers were not placing the 3Q'03 orders the Company had expected, causing it to miss its own sales projections and the rest of the projections based on those numbers. Defendants knew Mattel had significant relationships with its retailers, that Mattel had launched a massive ad campaign to market the PowerTouch and that Mattel's PowerTouch was selling quite well whereas the retailers were not placing new orders for the LeapPads.

39.    In the last week of the 3Q'03, defendants knew they had not received the orders they had expected and premised their 3Q'03 sales projections on and that some retailers had already told them they could not ship the orders they had received until the 4Q'03. Defendants knew that the delayed shipping would put the orders in jeopardy if the LeapFrog products did not compete well against the Mattel products and that these facts would concern the investment community if the truth was revealed. Still, defendants unloaded another $5+ million in LeapFrog stock without disclosing the adverse news known to them, as follows:

| Date | Name | Shares Sold | Price Sold At | Proceeds |
|---|---|---|---|---|
| 09/24/03 | Marggraff, L. James | 2,000 | $40.12 | $80,240 |
| 09/24/03 | Wood, Michael C. | 29,646 | $40.12 | $1,189,398 |
| 09/29/03 | Lally, Robert W. | 2,500 | $39.04 | $97,600 |
| 10/01/03 | Curley, James P. | 5,000 | $38.00 | $190,000 |
| 10/01/03 | Flowers, Mark B. | 10,000 | $38.76 | $387,600 |
| 10/01/03 | Marggraff, L. James | 2,000 | $38.76 | $77,520 |
| 10/01/03 | Wood, Michael C. | 23,717 | $38.76 | $919,271 |
| 10/01/03 | Rioux, Paul A. | 15,000 | $38.76 | $581,400 |
| 10/02/03 | Rioux, Paul A. | 15,000 | $40.15 | $602,250 |
| 10/03/03 | Bender, Timothy M. | 20,000 | $41.12 | $822,400 |
| 10/06/03 | Lally, Robert W. | 2,500 | $42.62 | $106,550 |

40.    On October 6, 2003, LeapFrog filed a patent infringement action against Mattel in the Federal District Court in Wilmington Delaware. The lawsuit alleged that the Company had been damaged by Mattel's product and marketing and that it would suffer "irreparable injury" unless the court stopped Mattel from selling the PowerTouch.

41. In order to dispel the investment community's concerns over the timing of the lawsuit and the implicit inference that LeapFrog was losing ground to Mattel, defendants issued a press release on October 8, 2003 entitled "LeapFrog's Award-Winning Leapster Handheld Poised to Jump From Store Shelves This Holiday Season." Leapster, due to be released on November 3, 2003, was slated to be LeapFrog's biggest seller ever. The article stated in relevant part as follows:

> As the excitement and anticipation of the holiday season nears, parents are already getting jumpy about finding the Leapster™ Multimedia Learning System that hits store shelves at the end of this month. LeapFrog Enterprises Inc., a leading designer, developer and marketer of innovative technology-based educational products, created the Leapster platform as an educational game player, electronic book reader, digital art studio and interactive video player to provide an innovative approach to learning and fun by teaching essential school skills in ways that kids love to play -- with a cool-looking handheld electronic device.
>
> "The Leapster will be one of the holiday gifts that parents of 4-8 year-olds will be clamoring to find this year," said Jim Silver, co-publisher of Toy Wishes. "With its full-color screen and game console format, it will be a big hit with kids who love electronic games, art, video and books, while parents will love the Leapster's many different educational aspects. Once again, LeapFrog has developed an item that lets kids learn while they play."
>
> "The Leapster handheld features both a touch-sensitive screen and different function buttons for enhanced fun and learning," said Mike Wood, CEO of LeapFrog. "We believe that the Leapster platform is one of the most innovative products in company history."
>
> "The first time my child tried the Leapster several months ago, she was hooked," said Dr. Jillian Barrett. "Since then, she has been begging me almost daily to get her a Leapster, claiming that she 'needs it.'"
>
> Parents will be able to first purchase the Leapster Multimedia Learning System on October 30, with exclusive availability at Toys "R" Us in Times Square, New York City. LeapFrog will host an event that morning with a special presentation at the store.

42. The Company's 3Q'03 came to an end on September 30, 2003 and although a few more orders had come in in the last week of the quarter, many retailers had refused to accept shipments until 4Q'03, so LeapFrog would not be permitted to recognize the revenue for these sales in 3Q'03 as it had expected, and LeapFrog had still not received the volume of orders it had expected from the retailers. Defendants decided not to release the 3Q'03 results until three weeks after the end of the quarter. Bear Stearns continued republishing the earnings estimate of $0.61 per share and

defendants sold an additional $4.3+ million in LeapFrog stock at inflated prices before the release as follows:

| Date | Name | Shares Sold | Price Sold At | Proceeds |
|------|------|-------------|---------------|----------|
| 10/07/03 | Flowers, Mark B. | 5,000 | $43.06 | $215,300 |
| 10/07/03 | Kalinske, Thomas J. | 25,000 | $42.70 | $1,067,560 |
| 10/08/03 | Wood, Michael C. | 23,717 | $43.95 | $1,042,318 |
| 10/08/03 | Marggraff, L. James | 2,000 | $43.95 | $87,900 |
| 10/15/03 | Marggraff, L. James | 2,000 | $45.16 | $90,320 |
| 10/15/03 | Wood, Michael C. | 23,717 | $45.16 | $1,071,060 |

43.    On October 21, 2003, with their own pockets more than $18 million fuller, the defendants shocked the market by finally disclosing the Company's actual 3Q'03 financial results and reporting that a significant amount of its retailers' orders had not come in until the end of the quarter and that many retailers had refused to accept shipment until 4Q'03, causing LeapFrog to miss its 3Q'03 sales projection by 11%, its own gross profit margin and operating income projections, and barely making is own $0.55 to $0.58 per share earnings guidance and drastically missing the $0.61 per share analysts had been forecasting based on information defendants provided. Defendants attempted to increase the Company's 4Q'03 guidance to make up for the missing sales, but LeapFrog lost credibility with the investment community and analysts openly questioned the Company's 4Q'03 guidance.

44.    The true facts which were known by each of the defendants, but concealed from the investing public during the Class Period, were that:

(a)    Throughout 3Q'03, retailers were not placing the level of orders defendants expected as part of the typical pre-Christmas inventory build-up;

(b)    Retailers were also refusing to allow LeapFrog to ship some orders during 3Q'03, instead requiring LeapFrog to bear the risk of holding the product into the Christmas selling

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS          - 15 -

season to see if the new products gained customer acceptance and to see how well they competed against Mattel's PowerTouch;

          (c)     Defendants were not replenishing LeapFrog's own inventory throughout the Class Period in anticipation of reduced sales; and

          (d)     Defendants knew during the Class Period that Mattel's launch of PowerTouch had severely damaged LeapFrog and diminished its market share, causing the Company to file an action seeking injunctive relief against Mattel on October 6, 2003 (one week after the close of its 3Q'03 and two weeks before its 3Q'03 results would be released), claiming LeapFrog would be "irreparably injured" unless the court stopped Mattel from selling its PowerTouch.

## FIRST CLAIM FOR RELIEF

### For Violation Of §10(B) of fhe 1934 Act
### And Rule 10b-5 Against All Defendants

45.    Plaintiff incorporates ¶¶1-44 by reference.

46.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  Defendants also failed to disclose material adverse information in connection with their sales of LeapFrog stock.

47.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

          (a)     Employed devices, schemes, and artifices to defraud;

          (b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

          (c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of LeapFrog common stock during the Class Period.

48.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for LeapFrog common stock.  Plaintiff and the Class would not have purchased LeapFrog common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

49.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of LeapFrog common stock during the Class Period.

## SECOND CLAIM FOR RELIEF

### For Violation of §20(A) of the 1934 Act
### Against All Defendants

50.     Plaintiff incorporates ¶¶1-49 by reference.

51.     The Individual Defendants acted as controlling persons of LeapFrog within the meaning of §20(a) of the 1934 Act.  By reason of their positions as officers and/or directors of LeapFrog, and their ownership of LeapFrog stock, the Individual  Defendants had the power and authority to cause LeapFrog to engage in the wrongful conduct complained of herein.  LeapFrog controlled each of the Individual Defendants and all of its employees.  By reason of such conduct, the Individual Defendants and LeapFrog are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

52.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased LeapFrog common stock (the "Class") on the open market during the Class Period.  Excluded from the Class are defendants.

53.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to

the parties and the Court.  LeapFrog had more than 26.3 million shares of stock outstanding, owned by hundreds if not thousands of persons.

54.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether the 1934 Act was violated by defendants;

(b)    Whether defendants omitted and/or misrepresented material facts;

(c)    Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)    Whether the price of LeapFrog common stock was artificially inflated; and

(f)    The extent of damage sustained by Class members and the appropriate measure of damages.

55.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

56.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

57.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.    Awarding plaintiff and the members of the Class compensatory damages, interest and costs;

C.    Awarding plaintiff and members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs;

D.    Awarding extraordinary, equitable or injunctive relief as permitted by law or equity; and

E.    Awarding such other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  December 2, 2003

MILBERG WEISS BERSHAD
 HYNES & LERACH LLP
PATRICK J. COUGHLIN

_____
PATRICK J. COUGHLIN

100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

MILBERG WEISS BERSHAD
 HYNES & LERACH LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
401 B Street, Suite 1700
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

LAW OFFICES OF MARC S. HENZEL
MARC S. HENZEL
273 Montgomery Avenue, Suite 202
Bala Cynwyd, PA  19004
Telephone:  610/660-8000
610/660-8080 (fax)

Attorneys for Plaintiff

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 19 -

**CERTIFICATION OF INTERESTED ENTITIES OR PERSONS**

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

_____
ATTORNEY OF RECORD FOR
PLAINTIFF JERRY MILLER

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS            - 20 -