LEO P. CUNNINGHAM, State Bar No. 121605
BORIS FELDMAN, State Bar No.128838
DANIEL W. TURBOW, State Bar No. 175015
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email: lcunningham@wsgr.com

Attorneys for Defendants
LEAPFROG ENTERPRISES, INC.,
TIMOTHY M. BENDER, JAMES P.
CURLEY, THOMAS J. KALINSKE
and MICHAEL C. WOOD

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re LEAPFROG ENTERPRISES, INC., SECURITIES LITIGATION | No. C-03-05421 (RMW) And Related Cases |
| | CLASS ACTION |
| This Document Relates to: | **LEAPFROG ENTERPRISES, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| All Actions. | DATE: February 9, 2007 TIME: 9:00 a.m. JUDGE: Hon. Ronald M. Whyte |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION TO DISMISS ................................................................i

ISSUES TO BE DECIDED (Civil Local Rule 7-4(a)(3)) ....................................................i

MEMORANDUM OF POINTS AND AUTHORITIES ...........................................................1

INTRODUCTION...................................................................................................................1

BACKGROUND AND SUMMARY OF ALLEGATIONS ....................................................2

ARGUMENT ..........................................................................................................................5

I.      NONE OF THE CHALLENGED STATEMENTS IS ACTIONABLE ...........................5

      A.     The Reform Act Immunizes LeapFrog's Statements .........................................5

      B.     This Court Has Held that LeapFrog's Risk Factors Are Not Actionable...............7

      C.     Defendants' General Expressions of Optimism Are Not Actionable....................7

      D.     Defendants Are Not Liable For Statements Made By Analysts.............................8

      E.     Plaintiffs' Allegations Do Not Establish Loss Causation Regarding
            PowerTouch .........................................................................................................9

II.     PLAINTIFFS' CONFIDENTIAL WITNESS ALLEGATIONS ARE DEFICIENT .......10

III.    PLAINTIFFS STILL FAIL TO ADEQUATELY ALLEGE ANY FALSE
      STATEMENT OR OMISSION .................................................................................12

      A.     Plaintiffs' PowerTouch Allegations Fail To State A Claim................................12

            1.     Defendants Did Not Conceal the Competition with PowerTouch ...........12

            2.     Plaintiffs fail to plead adequately a false or misleading statement
                 regarding PowerTouch .....................................................................14

IV.    DEFENDANTS MADE NO FALSE STATEMENTS ABOUT LEAPFROG'S
      OPERATIONS .........................................................................................................18

      A.     The Alleged Problems with DSS in 2003 and early 2004 Do Not Render
            Any Challenged Statement False .......................................................................18

      B.     The Alleged Delays and Problems with FDC in mid-2004 Do Not Render
            Any Challenged Statement False .......................................................................19

      C.     The Complaint Pleads No New Facts that Would Render False LeapFrog's
            Statements Concerning The Implementation of Manugistics ..............................21

V.     PLAINTIFFS FAIL TO PLEAD SPECIFIC FACTS CREATING A STRONG
      INFERENCE OF SCIENTER.....................................................................................25

CONCLUSION ......................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amalgamated Bank v. Coca-Cola Co.*,
    No. CIV. A. 1:05-CV-1226, 2006 WL 2818973 (N.D. Ga. Sept. 29, 2006) .....................8

*Barnard v. City of Chicago Heights*,
    No. 91 C 3626, 1992 WL 309567 (N.D. Ill. Oct. 22, 1992) ...............................................13

*Brody v. Transitional Hosps. Corp.*, 280 F.3d 997 (9th Cir. 2002) ...........................12, 17, 18, 25

*Cutsforth v. Renschler*,
    235 F. Supp. 2d 1216 (M.D. Fla. 2002) .........................................................................22

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).........................................................i, 9

*Employers Teamsters Local Nos. 175 and 505 Pension Plan Trust Fund v. Clorox
    Co.*, 353 F.3d 1125 (9th Cir. 2004) .................................................................................7

*Harris v. IVAX Corp.*, 182 F.3d 799 (11th Cir. 1999) ......................................................................5

*Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971 (9th Cir. 1999) ........................................21

*Hillson Partners Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204 (4th Cir. 1994) ...........................22

*In re Applied Signal Tech., Inc. Sec. Litig.*,
    No. C 05-1027 SBA, 2006 WL 1050174 (N.D. Cal. Feb. 8, 2006) ..........................*passim*

*In re Business Objects SA Sec. Litig.*,
    No. C 04-2401 MJJ, 2005 WL 1787860 (N.D, Cal. July 27, 2005) .................................24

*In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857 (N.D. Cal. 2004) ...........................5, 6, 7

*In re DSP Group, Inc. Sec. Litig.*, No. C 95-4025-CAL, 1997 WL 678151 (N.D.
    Cal. Mar. 5, 1997) .........................................................................................................14

*In re Daou Systems, Inc.*, 411 F.3d 1006 (9th Cir. 2005) *cert denied, Daou Systems,
    Inc. v. Sparling*, 126 S. Ct. 1335 (2006).....................................................................9, 10

*In re ESS Tech., Inc. Sec. Litig.*,
    No. C-02-04497 RMW, 2004 WL 3030058 (N.D. Cal. Dec. 1, 2004) .......................7, 12

*In re Foundry Networks, Inc., Sec. Litig.*,
    No. C 00-4823 MMC, 2003 WL 22077729 (N.D. Cal. Aug. 29, 2003) ..........................15

*In re Foundry Networks, Inc. Sec. Litig.*,
    No. C 00-4823 MMC, 2003 WL 23211577 (N.D. Cal. Feb. 14, 2003) .............................7

*In re Gilead Sciences Sec. Litig.*,
    No. C-03-4999 MJJ, 2005 WL 2649200 (N.D. Cal. Oct. 11, 2005) .................................9

*In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056
    (W.D. Wash. 2003) .......................................................................................................10

*In re Metricom Sec. Litig.,*
    No. C 01-4085, 2004 WL 966291 (N.D. Cal. Apr. 29, 2004)............................21

*In re Netflix, Inc. Sec. Litig.,*
    No. C 04-2978-FMS, 2005 WL 1562858 (N.D. Cal. June 28, 2005) ........................7, 13

*In re Netflix Inc. Sec. Litig.,*
    No. C 04-2978 WHA, 2005 WL 3096209 (N.D. Cal. Nov. 18, 2005) ............................25

*In re Pacific Gateway Exchange, Inc. Sec. Litig.,*
    No. C-00-1211 PJH, 2002 WL 851066 (N.D. Cal. April 30, 2002) *aff'd,*
    *Winick v. Pacific Gateway Exchange, Inc.,* [2003-2004 Transfer Binder]
    Fed. Sec. L. Rep. (CCH) ¶ 92,652 (9th Cir. Aug. 15, 2003)............................20

*In re Pixar Sec. Litig.,* 450 F. Supp. 2d 1096 (N.D. Cal. 2006) ......................................11

*In re Read-Rite Corp. Sec. Litig.,*
    No. C-03-03148 RMW, 2004 WL 2125883 (N.D. Cal. Sept. 22, 2004) ........................16

*In re Siebel Systems, Inc. Sec. Litig.,*
    No. C 04-0983 CRB, 2005 WL 3555718 (N.D. Cal. Dec. 28, 2005) ............................10

*In re Skechers U.S.A., Inc. Sec. Litig.,*
    No. CV 03-02094 PA, 2004 WL 1080174 (C.D. Cal. May 7, 2004)..............................15

*In re Stac Elecs. Sec. Litig.,* 89 F.3d 1399 (9th Cir. 1996) ..........................................21

*In re Sun Microsystems, Inc. Sec. Litig.,*
    No. C-89-20351-RPA, 1990 WL 169140 (N.D. Cal. Aug. 20, 1990) ............................14

*In re Syntex Corp. Sec. Litig.,*
    No. 92-20548 SW, 1993 WL 476646 (N.D. Cal. Sept. 1, 1993) .................................14

*In re Tibco Software, Inc.,*
    No. C 05-2146 SBA, 2006 WL 1469654 (N.D. Cal. May 25, 2006)....................5, 11, 24

*In re Vantive Corp. Sec. Litig,* 283 F.3d 1079 (9th Cir. 2002)........................12, 17, 23

*In re Verisign Corp. Sec. Litig.,*
    No. C 02-02270 JW, 2005 WL 2893783 (N.D. Cal. Nov. 2, 2005)..........................9, 10

*Kuehbeck v. Genesis Microchip,*
    No. C 02-05344 JSW, 2005 WL 1787426 (N.D. Cal. July 27, 2005)............................11

*Limantour v. Cray Inc.,* 432 F. Supp. 2d 1129 (W.D. Wash. 2006) ..................................9

*Lipton v. Pathogenesis Corp.,* 284 F.3d 1027 (9th Cir. 2002) ..................................12, 25

*Morgan v. AXT, Inc.,* No. C 04-4362 MJJ, C 05-5106 MJJ, 2005 WL 2347125
    (N.D. Cal. Sept. 23, 2005)................................................................9, 11

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226
    (9th Cir. 2004).............................................................................10

*Osher v. JNI Corp.,* 308 F. Supp. 2d 1168 (S.D. Cal. 2004)..........................................8

*Plevy v. Haggerty,* 38 F. Supp. 2d 816 (C.D. Cal. 1998) ..........................................7, 8

*Reddy v. Litton Indus., Inc.*, 912 F.2d 291 (9th Cir. 1990) ............................................................13

*Riggs v. U.S.*, No. CV 96-2780 JGD, 1996 WL 756511 (C.D. Cal. Aug. 19, 1996) ....................13

*Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001) ...........................................................19, 23, 24

*Schuster v. Symmetricom, Inc.,*
    No. C 94-20024-RMW, 2000 WL 33115909 (N.D. Cal. Aug. 1, 2000).........................12

*Steinberg v. PRT Group, Inc.*, 88 F. Supp. 2d 294 (S.D.N.Y. 2000) .....................................13, 14

*Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231 (N.D. Cal. 1998) .............................................7, 8, 9

*Wessel v. Buhler*, 437 F.2d 279 (9th Cir. 1971) .........................................................................12

*Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102 (N.D. Cal. 2003)...............................11

*Zeid v. Kimberley*, 930 F. Supp. 431 (N.D. Cal. 1996) ...............................................................7

## STATUTES

15 U.S.C. § 78u-4(b)(1)(B) .................................................................................................10, 12

15 U.S.C. § 78u-5(c) ......................................................................................................................5

15 U.S.C. § 78u-5(i) .......................................................................................................................6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*NOTICE OF MOTION AND MOTION TO DISMISS*

Please take notice that on February 9, 2007, at 9:00 a.m., or as soon thereafter as the matter may be heard, in the Courtroom of the Honorable Ronald M. Whyte, United States District Court, 280 South First Street, San Jose, California, defendant LeapFrog Enterprises, Inc. ("LeapFrog" or "the Company") will, and hereby does, move to dismiss Plaintiffs' Second Amended Consolidated Class Action Complaint ("Complaint" or "SAC").

LeapFrog moves to dismiss the Complaint for failure to satisfy the pleading requirements of the Private Securities Litigation Reform Act ("Reform Act") and Rule 12(b)(6) of the Federal Rules of Civil Procedure, and failure to allege loss causation as required by *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005). The individual defendants have separately moved to dismiss the Complaint ("Ind. Mot."). LeapFrog joins in that motion, and the individual defendants join in this motion. This motion is supported by the accompanying memorandum of points and authorities, the Declaration of Daniel W. Turbow ("Turbow Decl.") and attached exhibits filed concurrently herewith ("Ex. ___"), all pleadings and papers filed herein, argument of counsel and any other matters properly before the Court.

## ISSUES TO BE DECIDED (Civil Local Rule 7-4(a)(3))

1.    Does the Complaint correct the defects found by the Court in the prior complaint?

2.    Does the Complaint allege an actionable false statement or omission, including whether the Reform Act Safe Harbor applies and whether Plaintiffs have alleged loss causation?

3.    Have Plaintiffs alleged with particularity facts establishing falsity and giving rise to a strong inference that Defendants acted with scienter as required by the Reform Act?

4.    Have Plaintiffs alleged with "great detail" "all facts" forming the basis of their allegations as required by the Reform Act?

1

*MEMORANDUM OF POINTS AND AUTHORITIES*

2

**INTRODUCTION**

3    No one at LeapFrog lied.  This lawsuit is the result of drops in LeapFrog's stock price

4  resulting from LeapFrog's announcement of results that unexpectedly fell short of predictions.

5  Missed forecasts, however, are not fraud.  This Complaint is Plaintiffs' third attempt to plead a

6  securities fraud claim against Defendants.  The Court dismissed the last complaint recognizing

7  that it lacked any facts rendering any challenged statement false or made with scienter.

8    Plaintiffs' latest Complaint fares no better.  Plaintiffs have abandoned their claims

9  against many of the Company's former officers, as well as their accounting allegations.  They

10  have also changed the crux of their case, which is no longer focused on LeapFrog's 3Q03

11  shortfall (the subject of the first complaint in this action).  Plaintiffs now devote most of their

12  Complaint to attacking LeapFrog's forecasts in 2004 and statements concerning the progress of

13  operations initiatives the Company was attempting to complete in 2004.  Plaintiffs continue to

14  allege these statements were false based on purportedly undisclosed information about

15  PowerTouch, as well as accounts from Confidential Witnesses ("CWs") about the state of

16  development of the operations initiatives.

17    There are scarcely any new facts pleaded in the Complaint, and the few additional facts

18  cannot salvage Plaintiffs' claims.  Because many of the alleged false statements were forward-

19  looking and were accompanied by meaningful and cautionary statements, including extensive

20  disclosures about the progress – and "significant challenges" – the Company faced with its

21  operations initiatives, the Safe Harbor insulates all of the forward-looking statements from

22  challenge.  Many other statements are immune from challenge because they are simply vague

23  statements of corporate optimism upon which no reasonable investor could rely.

24    For all of the other challenged statements, none of the new (or old) allegations are

25  sufficient because the Complaint fails to plead particularized and contemporaneous facts –

26  required to state a claim under Section 10(b) – reflecting the falsity of any statement *when*

27  *made*.  Finally, as set forth in detail in the accompanying motion to dismiss of the Individual

28  Defendants, Plaintiffs have not pleaded any new facts creating a strong inference of scienter.

1    The Complaint should now be dismissed with prejudice.

2    **BACKGROUND AND SUMMARY OF ALLEGATIONS**

3    LeapFrog is a Delaware corporation based in Emeryville, California that has been

4    designing, developing, and marketing innovative technology-based educational products since

5    1995.  In the short time since its Initial Public Offering in July 2002, LeapFrog experienced

6    impressive, year-over-year increases in the Company's revenues, quickly becoming one of the

7    largest toy companies in the United States. SAC ¶ 18.

8    **2003:**  The Class Period begins on July 24, 2003 with the announcement of a strong

9    quarter and predictions of even stronger growth and earnings for the remainder of 2003. *Id.* ¶ 72.

10    Plaintiffs contend that LeapFrog made false statements in July 2003 because it failed to disclose

11    distribution and supply-chain problems and increased competition from Mattel's recently-

12    released PowerTouch product. *See, e.g., id.* ¶¶ 25, 73.  Plaintiffs concede, however, that (a) the

13    impact from PowerTouch was well known because this was one of Mattel's largest ever product

14    introductions; (b) PowerTouch's release caused LeapFrog's stock price to fall by four points in

15    the two weeks prior the Class Period; and (c) LeapFrog sued Mattel on October 3, 2003, alleging

16    that PowerTouch infringed LeapFrog's LeapPad patent. *Id.* ¶¶ 23, 31.

17    On October 21, 2003, LeapFrog announced another strong quarter of sales and earnings,

18    but its results fell short of expectations, causing the stock price to drop 25%. *Id.* ¶¶ 32, 139.  The

19    Company explained that the shortfall was the result of a combination of factors, including late-

20    building demand and shipping and logistics problems. *Id.* ¶¶ 32-33, 87-88.  Consistent with its

21    belief that the miss was a transient phenomenon, the Company revised its revenue forecasts for

22    the upcoming quarter upward and maintained its forecasts for the entire year.  Michael Wood,

23    LeapFrog's former CEO, stated in the earnings call the next day that LeapFrog was attempting to

24    address those operational problems with additional resources. *Id.* ¶ 88.  On the same call, Mr.

25    Wood acknowledged that LeapFrog was facing stronger competition, including from

26    PowerTouch.  Amended Consolidated Complaint ("AC") ¶ 226(c).

27    **2004:**  On February 10, 2004, LeapFrog reported strong sales and earnings for its fourth

28    quarter ("4Q03") and 2003 fiscal year in line with the upwardly revised guidance it had predicted

on October 21 and provided financial guidance for the 2004 fiscal year.  SAC ¶ 42.  LeapFrog's stock price, however, declined another 11% on this announcement due to lower-than-expected margins in 4Q03 and forecasted flat margins in 2004.  *Id.* ¶ 139.  Plaintiffs allege that LeapFrog knew it would not meet its 2004 guidance because of competition from PowerTouch and because of ongoing distribution and supply-chain problems.  *Id.* ¶¶ 44, 96.  Plaintiffs, however, do not identify any internal documents or contemporaneous accounts contrary to these projections.

A month later, on March 10, 2004, the Company pre-announced that it would fall short of its forecasts for the first quarter of 2004, causing LeapFrog's stock price to drop another 25%.  *Id.* ¶¶ 45, 139.  Nevertheless, Plaintiffs allege that LeapFrog's scheme to inflate the stock price continued by failing to lower its full year projections.  *Id.* ¶ 46.

On April 21, 2004, the Company reported its results for 1Q04 in line with the March 10 pre-announcement.  It issued reduced projections for its 2004 fiscal year due to slower-than-expected sales of the Company's key products and uncertainty with the overall strength in the toy industry.  *Id.* ¶ 49.  Plaintiffs allege that LeapFrog misled investors on April 21 when it stated that its new supply-chain management system was "up and running" and that "all aspects" of its warehouse consolidation in the new Fontana Distribution Center ("FDC") facility were on track to be "fully" operational by the end of 2Q04.  *Id.* ¶ 104.  Plaintiffs allege LeapFrog's statements were false because certain CWs contend that LeapFrog was suffering severe problems and delays with its supply-chain and warehouse consolidation initiatives.  *Id.* ¶ 105.  Plaintiffs ignore statements by Thomas Kalinske, who had become LeapFrog's CEO and Chairman, on the very same call that development of the supply-chain management system was a work in progress and that LeapFrog continued to work with manual processes in parallel until the new systems were fully tested and operational.  Ex. 13 at 9-10.  Plaintiffs also admit that LeapFrog disclosed on that call that the FDC consolidation was still in progress and was not expected to be complete until the end of 2Q04 – *i.e.,* the end of June 2004.  SAC ¶ 104.  Plaintiffs again ignore LeapFrog's disclosures in its SEC filings throughout the Class Period cautioning that the Company faced "*significant challenges*" in all of these operations initiatives.  Exs. 2 at 24; 6 at 25.

On July 21, 2004, LeapFrog reported its financial results for its 2Q04: sales had increased 19% from the comparable period in 2003, but margins were lower than expected. SAC ¶ 121. The Company reaffirmed its forecasts for the remainder of the year, and Mr. Kalinske stated that LeapFrog was "making progress" with its supply-chain initiatives and reported that LeapFrog would "maintain a level of redundancy with our warehouses until the new facility has been fully tested." *Id.* ¶ 122. Plaintiffs allege that these statements were false because of ongoing competition from PowerTouch and delays in implementing LeapFrog's operational initiatives. *Id.* ¶¶ 53, 123. Plaintiffs ignore, however, that LeapFrog fully disclosed that it had not yet begun shipping from FDC. *Id.* ¶ 122.

The Class Period ends with LeapFrog's announcement on October 18, 2004 that its 3Q04 results would fall short of predictions due to the very risks of which it had previously warned: continued slowness in LeapPad sales and challenges in getting its operations initiatives fully operative. *Id.* ¶ 130. Plaintiffs allege that with this announcement, LeapFrog had finally disclosed all the information that it had allegedly concealed over a period of 15 months and thereby removed any alleged inflation from LeapFrog's stock price. *Id.* ¶ 138.

**The Order Granting the Motions to Dismiss the Prior Complaint:**  On July 31, 2006, the Court granted Defendants' motions to dismiss Plaintiffs' prior Amended Consolidated Complaint in its entirety (the "Order"). The Court found that the prior complaint did not specify which statements were alleged to be false, and failed to show that *any* challenged statement was false when made or that any defendant knew that any statement was false when made. Order at 2-4. In particular, the Court held that Plaintiffs' allegations regarding various operational problems and competition did not show that any challenged statement was false when made, let alone give rise to a strong inference of scienter. *Id.* at 3-4. The Court further noted that the allegations were "largely conclusory, vague, made without reference to time, or provide no indication of falsity or knowledge of falsity." *Id.* at 3. The Court specifically rejected Plaintiffs' attempt to plead a securities claim by challenging LeapFrog's risk factors in the Company's filings with the Securities and Exchange Commission ("SEC"), holding that these risk factors could not be affirmative misstatements. *Id.* at 3 n.2.

The Court granted Plaintiffs leave to amend but only with respect to the claims grounded on PowerTouch competition and supply-chain and distribution problems. *Id.* at 6. The Court precluded Plaintiffs from re-pleading their claims based on other substantive allegations unless Plaintiffs could "set forth clearly" another ground. *Id.*

As explained more fully below and in the Individual Defendants' Motion to Dismiss, nothing in this new Complaint remedies the deficiencies of the prior complaint. Consequently, this Complaint should be dismissed without leave to amend.

## ARGUMENT

I.     **NONE OF THE CHALLENGED STATEMENTS IS ACTIONABLE**

A.     **The Reform Act Immunizes LeapFrog's Statements**

The Reform Act's "safe harbor" ("Safe Harbor") shields defendants from liability for any "forward-looking" statement that is identified and accompanied by "meaningful cautionary statements." 15 U.S.C. § 78u-5(c). A "forward-looking" statement includes: (A) "a statement containing a projection of revenues," (B) "a statement of the plans and objectives of management for future operations," (C) "a statement of future economic performance," and (D) "any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C)." *Id.* § 78u-5(i). Because the definition of "forward-looking statement" includes "any statement of the assumptions underlying or relating" to projections, predictions, plans and the expressed objectives of management, statements that grammatically appear in the present tense may still be forward-looking "'if the truth or falsity of that statement cannot be discerned until some point in time after the statement is made.'" *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 880 (N.D. Cal. 2004) (citation omitted); *In re Tibco Software, Inc.*, No. C 05-2146 SBA, 2006 WL 1469654, at *26 (N.D. Cal. May 25, 2006) (same); *In re Applied Signal Tech., Inc. Sec. Litig.*, No. C 05-1027 SBA, 2006 WL 1050174, at *16 (N.D. Cal. Feb. 8, 2006) (same); *Harris v. IVAX Corp.*, 182 F.3d 799, 806-07 (11th Cir. 1999) (historical statements are forward-looking if part of an underlying forecast).

Virtually all of the statements Plaintiffs challenge here are not actionable because they are forward-looking statements and were accompanied by meaningful cautionary language.

1  LeapFrog's financial forecasts and statements related to those forecasts are quintessentially

2  forward-looking statements.  SAC ¶¶ 42-43, 45, 49-50, 53, 72, 78, 87-89, 99, 102, 104, 121-22;

3  *see* 15 U.S.C. § 78u-5(i); *Applied Signal*, 2006 WL 1050174, at *16 (forecasts of future revenues

4  and income are forward-looking statements under PSLRA); *Copper Mountain*, 311 F. Supp. 2d at

5  880 (same).  The same is true of the very few statements that actually concerned the effect of

6  competition from PowerTouch.  *See* SAC ¶¶ 29, 42, 45, 53.  Statements about the inchoate

7  implementation of LeapFrog's supply-chain initiatives (*id.* ¶¶ 72, 78, 88, 99, 102, 104, 122) are

8  also forward-looking because they are related to LeapFrog's "plans and objectives of

9  management for [its] future operations" (15 U.S.C. § 78u-5(i)(1)(B)), and they could not be

10  established as true or false until after they were made.

11      Each of the forward-looking statements was accompanied by Reform Act warnings and

12  specific disclosures of relevant risks.  LeapFrog warned of risks related to forecasted demand,

13  competition, operational challenges and its ability to implement its supply-chain initiatives.  *See*

14  Exs. 2, 6, 11, 14, 17.  All of the earnings calls and press releases, as well as the September 17,

15  2003 ThinkEquity Conference, included explicit Safe Harbor warnings instructing investors to

16  review the specific risk factors and disclosures in LeapFrog's SEC filings.  *See* Exs. 1 at 2; 3 at

17  1, 11; 4 at 3; 5 at 2; 7 at 3; 8 at 2; 10 at 2; 12 at 2; 13 at 2; 15 at 2; 16 at 2.

18      The risk factors and disclosures in LeapFrog's SEC filings were extensive and explicitly

19  addressed relevant risks, including that:

20  • "[T]he logistics of supplying more product within shorter time periods will
   increase the risk that we fail to meet tight shipping schedules, which could
21  damage our relationships with retailers, increase our shipping costs or cause
   sales opportunities to be delayed or lost."  Exs. 2 at 19; 6 at 20; 11 at 36; 14 at
22  18-19; 17 at 25.

23  • LeapFrog's business was *very* competitive, and competition with formidable
   companies like Mattel was *increasing*.  Exs. 2 at 20; 6 at 21; 11 at 11-12; 14 at
24  19; 17 at 26.

25  • LeapFrog was "upgrading existing and implementing new operational software
   systems, including supply-chain management systems" and expanding its
26  shipping functions into a single new warehouse, and that this "*expansion has
   presented, and continues to present, significant challenges for our management
27  systems and resources.*"  Ex. 12 at 41 (emphasis added).  *See also* Exs. 2 at 24; 6
   at 25; 14 at 24; 17 at 30.

28

1    In light of these specific warnings and extensive cautionary statements, the Safe Harbor

2    immunizes all of Defendants' forward-looking statements. *See In re ESS Tech., Inc. Sec. Litig.*,

3    No. C-02-04497 RMW, 2004 WL 3030058, at *9 (N.D. Cal. Dec. 1, 2004) (Safe Harbor

4    protected defendants' statements); *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1248-49 (N.D.

5    Cal. 1998) (dismissing forecasts made in earnings call under Safe Harbor).[1]

6    **B.    This Court Has Held that LeapFrog's Risk Factors Are Not Actionable**

7    Plaintiffs continue to challenge LeapFrog's risk factors as false and misleading

8    statements notwithstanding the Court's Order holding that the risk factors are not themselves

9    actionable as misrepresentations. *See* SAC ¶¶ 25, 35, 47, 52, 54, 74, 93, 101, 106, 124-25;

10   Order at 3 n.2 ("To the extent plaintiffs are alleging that the risk factors themselves are

11   affirmative misstatements, plaintiffs' allegations fail."). *See also Zeid v. Kimberley*, 930 F.

12   Supp. 431, 437 (N.D. Cal. 1996) (risk factors not actionable as matter of law); *In re Foundry*

13   *Networks, Inc. Sec. Litig.*, No. C 00-4823 MMC, 2003 WL 23211577, at *10 (N.D. Cal. Feb.

14   14, 2003) (same); *Plevy v. Haggerty,* 38 F. Supp. 2d 816, 832 (C.D. Cal. 1998) (same).

15   Plaintiffs have pleaded nothing warranting a reversal of the Court's prior Order, and, therefore,

16   the Court should allow no claims based on risk factors.

17   **C.    Defendants' General Expressions of Optimism Are Not Actionable**

18   As with the previous complaint, a number of the statements Plaintiffs challenge are not

19   actionable for the added reason that they are merely vague and amorphous statements of general

20   corporate optimism. *In re Netflix, Inc. Sec. Litig.*, No. C 04-2978-FMS, 2005 WL 1562858, at

21   *7 (N.D. Cal. June 28, 2005). By their very nature, such statements are not capable of

22   "objective verification" and are thus not relied upon by investors. *See, e.g., Copper Mountain,*

---

23

24   [1] The Safe Harbor applies to forward-looking statements identified as such and
     accompanied by meaningful cautionary statements regardless of the Defendants' state of mind.

25   *See Employers Teamsters Local Nos. 175 and 505 Pension Plan Trust Fund v. Clorox Co.,* 353
     F.3d 1125, 1132-33 (9th Cir. 2004) (challenged statements were immunized by sufficient

26   cautionary language; court did not even address state of mind); *Applied Signal*, 2006 WL
     1050174, at *13 (when a forward-looking statement is accompanied by meaningful cautionary

27   statements, "liability cannot exist as a matter of law, regardless of the [state of] mind of the
     person making the statement."). Moreover, LeapFrog's repeated updates to its investors about

28   the risks it faced with competition and its operations initiatives undercut any inference of
     scienter. *See* Ind. Mot. at 2.

1  311 F. Supp. 2d at 868; *Amalgamated Bank v. Coca-Cola Co.*, No. CIV. A. 1:05-CV-1226,

2  2006 WL 2818973, at *7 (N.D. Ga. Sept. 29, 2006).

3    The SAC challenges many inactionable "soft" statements. *See, e.g.*, SAC ¶ 29 ("This is

4  going to be a very big second half for us"); ¶ 32 ("Our underlying sell-through at the retail level

5  remained very strong"); ¶ 42 ("consumer demand for our learning products is more vibrant than

6  ever"); ¶ 72 ("We feel very positive" and "we all feel good" "continue to make strong growth in

7  supply chain" "there's no boogie man out there"); ¶ 78 ("[we expect a] very big second half . . .

8  [we are] a financially disciplined company"); ¶ 99 ("We are also strengthening our operations

9  group, supply-chain management system and warehousing and logistics functions"); ¶¶ 121-22

10  ("We are pleased with our progress . . . we are prepared for the second half of 2004").

11    Courts routinely dismiss pleadings based on such puffery. *See, e.g., Wenger*, 2 F. Supp.

12  2d at 1246 (statement that "Lumisys expected this strong demand to continue for years" held

13  immaterial and puffing).  This Court should do the same.

14    **D.**  **Defendants Are Not Liable For Statements Made By Analysts**

15    The Complaint attempts to hold defendants responsible for analyst statements, but is

16  conspicuously silent as to the essential facts of what was said to these analysts and by whom.[2]

17  *Wenger*, 2 F. Supp. 2d at 1249; *Osher v. JNI Corp.*, 308 F. Supp. 2d 1168, 1182 (S.D. Cal.

18  2004) (allegations that analyst reports repeated information provided by defendants were

19  insufficient), *aff'd in part, vacated in part, remanded by on other grounds by*, [2006 Tr. Binder]

20  Fed. Sec. L. Rep. (CCH) ¶ 93,852 (9th Cir. May 12, 2006); *Plevy*, 38 F. Supp. 2d at 824

21  (complaint must "describe what statements Defendants allegedly made to the analysts.

22  Plaintiffs cannot assume that the analysts' reports simply repeated verbatim the statements

23  relayed to them by Defendants."); *see* SAC ¶¶ 27, 29, 76, 89, 91, 125, 128.  Nor do Plaintiffs

24  allege any facts reflecting that Defendants had adopted the contents of these reports.  Plaintiffs

25  do not "(1) identify the specific forecasts and name the insider who adopted them; (2) point to

26

27     [2] For example, Plaintiffs challenge an analyst's description of LeapFrog management as

28  "nonchalant" about PowerTouch, but allege no facts showing that management ever said they
were feeling "nonchalant" about competition.  SAC ¶¶ 27-28.

1  specific interactions between the insider and the analyst which allegedly gave rise to the

2  entanglement; and (3) state the dates on which the acts which allegedly gave rise to the

3  entanglement occurred." *Wenger*, 2 F. Supp. 2d at 1249 (citation omitted).  The absence of

4  such basic details precludes Defendants' liability for any analyst reports.

5

6  **E.    Plaintiffs' Allegations Do Not Establish Loss Causation Regarding PowerTouch**

7         Plaintiffs' claims based on purported allegations concerning PowerTouch fail for the

8  additional reason that Plaintiffs still do not plead a causal connection between the alleged

9  PowerTouch allegations and stock price drop that purportedly caused their losses.  *Dura*, 544

10  U.S. at 346-47; *In re Daou Systems, Inc.*, 411 F.3d 1006, 1025-26 (9th Cir. 2005) *cert denied,*

11  *Daou Systems, Inc. v. Sparling,* 126 S. Ct. 1335 (2006).  It is insufficient to simply point to *any*

12  negative announcement followed by a stock price drop.  Rather, Plaintiffs must allege that

13  LeapFrog's stock price declined when the allegedly omitted facts about *PowerTouch* reached

14  the public.  *See Applied Signal*, 2006 WL 1050174, at *20-22 (loss causation not established

15  where allegations did not link the topic of challenged statements to subsequent decline in stock

16  price; *Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1161-62 (W.D. Wash. 2006) (same).[3]

17         Plaintiffs claim that Defendants concealed from investors various details about the

18  impact of PowerTouch throughout the Class Period, and that the market learned the "truth" on

19  October 18, 2004.  *See* SAC ¶¶ 20-21, 28, 30, 37-38, 49-50, 130-32.  Yet LeapFrog revealed

20  nothing at all about sales lost to PowerTouch competition on October 18, let alone the various

21  "truths" about PowerTouch that were allegedly concealed.  Exs. 18, 19; SAC ¶¶ 19-22, 27-30,

22  34, 37-39, 49-50.  Plaintiffs base the Complaint on what they claim was revealed at the 2005

23  patent trial (SAC ¶¶ 16, 19-22, 28, 30, 37-41), but they cannot tie that testimony to damages

24

25         [3] *Accord In re Verisign Corp. Sec. Litig.,* No. C 02-02270 JW, 2005 WL 2893783, at *5-7
   (N.D. Cal. Nov. 2, 2005) (dismissing claims based on certain misrepresentations where
26  plaintiffs failed to plead loss causation as to those misrepresentations); *In re Gilead Sciences
   Sec. Litig.,* No. C-03-4999 MJJ, 2005 WL 2649200, at *7 (N.D. Cal. Oct. 11, 2005) (allegations
27  dismissed on loss causation grounds where no link between disclosure of the "truth" to the topic
   of the challenged statement); *Morgan v. AXT, Inc.*, No. C 04-4362 MJJ, C 05-5106 MJJ, 2005
28  WL 2347125, at *16 (N.D. Cal. Sept. 23, 2005) (same).

1   they allege occurred the prior year. *See Daou*, 411 F.3d at 1026-27 (loss causation cannot be

2   established based on revelations long after the alleged losses occurred); *Verisign*, 2005 WL

3   2893783, at *6-7 (same). There is no connection between the October 18 announcement and

4   Plaintiffs' PowerTouch allegations.

5         In an attempt to create that missing connection, Plaintiffs now allege that Mr. Kalinske's

6   October 18 statements that the "operating climate in the United States is tougher" and that

7   LeapFrog was "experiencing softness" in LeapPad sales revealed the "truth" about LeapPad

8   sales lost to competition. *See* SAC ¶¶ 130, 132, 136-38. In portions of the transcript omitted by

9   Plaintiffs, however, Mr. Kalinske made clear that the "tough operating climate" was a reference

10  to the increased cost of commodities and transportation, and an industry-wide decline in toy

11  sales. Ex. 19. Similarly, Mr. Kalinske clarified that the "softness" in LeapPad sales occurred

12  because LeapPad was LeapFrog's oldest product platform – *not* because of PowerTouch

13  competition. *Id.* at 3, 7. This was in no way the revelation of the "extent of . . . LeapPad sales

14  lost to competition" that Plaintiffs claim it to be (SAC ¶ 138). There is simply no causal

15  connection between the alleged losses and the alleged PowerTouch statements and omissions.

16  The PowerTouch claims should be dismissed for this reason alone.

17  **II.    PLAINTIFFS' CONFIDENTIAL WITNESS ALLEGATIONS ARE DEFICIENT**

18        The Reform Act requires that, if an allegation is made on "information and belief," the

19  "complaint shall state with particularity *all facts on which that belief is formed*." 15 U.S.C.

20  § 78u-4(b)(1)(B) (emphasis added). Here, Plaintiffs do not purport to have personal knowledge

21  of the alleged fraud; rather, they rely upon the supposed accounts of CWs to plead their claims.

22  *See* SAC ¶¶ 2, 20, 51, 57-61, 64-68, 71, 80-83, 85-86, 90, 95, 102-103, 107-20. To satisfy the

23  Reform Act, allegations attributed to a confidential witness "must be accompanied by enough

24  particularized detail to support a reasonable conviction in the informant's basis of knowledge."

25  *In re Siebel Systems, Inc. Sec. Litig.*, No. C 04-0983 CRB, 2005 WL 3555718, at *8-9 (N.D.

26  Cal. Dec. 28, 2005) (quoting *In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d

27  1056, 1068 (W.D. Wash. 2003)); *see also Nursing Home Pension Fund, Local 144 v. Oracle*

28  *Corp.*, 380 F.3d 1226, 1233 (9th Cir. 2004) ("personal sources of information relied upon in a

complaint should be 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged'") (citation omitted).  Plaintiffs must also plead specific facts showing that the CWs were in a position to have knowledge of what Defendants knew. *In re Pixar Sec. Litig.*, 450 F. Supp. 2d 1096, 1103 (N.D. Cal. 2006); *Morgan*, 2005 WL 2347125, at *11.

The Complaint fails to meet this standard.  Plaintiffs simply cite CWs (sometimes several) after general summaries of "factual" allegations with no indication of the facts supplied by each CW, let alone each CW's basis for personal knowledge of those facts.  Also, "the descriptions of the duties performed by most of the witnesses do not satisfactorily demonstrate that the witnesses would know the information that is ascribed to them." *Tibco*, 2006 WL 1469654, at *22; SAC ¶ 2.[4]  Instead, most of the CWs speak on matters for which he or she appears to lack first-hand knowledge based on the job titles or descriptions provided.[5]  No CWs reported directly to any Defendant (SAC ¶ 2), and none purport to have been in direct contact with a Defendant as would be required to adequately allege what a Defendant knew at specific times. *See Tibco*, 2006 WL 1469654, at *22; *Kuehbeck v. Genesis Microchip*, No. C 02-05344 JSW, 2005 WL 1787426, at *5-7 (N.D. Cal. July 27, 2005) (discounting allegations made by direct reports because of lack of physical or verbal contact with defendants).  Accordingly, these allegations premised on assertions by the CWs are insufficient under the Reform Act.

---

[4] Several CWs were not even LeapFrog employees.  *See* SAC ¶ 2 (CW12, CW 13); *Tibco*, 2006 WL 1469654, at *22 (dismissing witness allegations because witnesses did not work at corporate headquarters).  More than half of the CWs were even not present at the Company for the entire Class Period.  SAC ¶ 2; *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1113 (N.D. Cal. 2003) (dismissing witness allegations due to lack of "insight into the time frame or context in which the statements were made").  Twelve of the 17 CWs (1, 5, 6, 7, 10-17) were low-level employees outside of the executive chain-of-command.  SAC ¶ 2; *Tibco*, 2006 WL 1468654, at *22 (reporting structure important to assessing credibility of witnesses).

[5] *See, e.g.*, SAC ¶ 60 (CW2 – director of IT opining on DSS delivery issues); ¶ 66 (CW11 – assistant controller discussing supply-chain problems); ¶ 69 (CW10 – systems program manager opining on sales and inventory issues); ¶ 70 (CW7 – R&D employee discussing delays in supply-chain and distribution); ¶ 110 (CW5 – contract employee reporting on high-level negotiations).

III.    **PLAINTIFFS STILL FAIL TO ADEQUATELY ALLEGE ANY FALSE STATEMENT OR OMISSION**

The Reform Act imposes heightened pleading requirements for pleading a false statement or omission. *See* 15 U.S.C. § 78u-4(b)(1). To survive a motion to dismiss, "the complaint must 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading[.]'" *ESS*, 2004 WL 3030058, at *8 (quoting *id.*). A plaintiff must allege corroborating facts such as the existence of, and details from, specific, contemporaneous documentary or testimonial evidence. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035-36 (9th Cir. 2002).

There is no general duty to disclose; to the extent that a Section 10(b) claim is based upon an alleged omission, a plaintiff must establish that the omission occurred "as part of an affirmative statement." *Wessel v. Buhler*, 437 F.2d 279, 283 (9th Cir. 1971). The allegedly omitted information must have rendered a specific statement materially misleading by affirmatively creating "an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). A statement does not become actionable merely because it is "incomplete." *Id.*; *In re Vantive Corp. Sec. Litig*, 283 F.3d 1079, 1085 (9th Cir. 2002) (same). As before, Plaintiffs fail to adequately allege a single false or misleading statement or omission.

A.    **Plaintiffs' PowerTouch Allegations Fail To State A Claim**

1.    **Defendants Did Not Conceal the Competition with PowerTouch**

Plaintiffs allege, with no new facts, that numerous statements – most of which were unrelated to PowerTouch – were rendered false because Defendants omitted details concerning competition from PowerTouch. *See* SAC ¶¶ 25-30, 32-36, 42-54. These allegations are inadequate because competition from PowerTouch was obvious to the market and repeatedly disclosed. The entire world became aware of PowerTouch once it appeared on retailers' shelves in July 2003, prior to the Class Period. *Id.* ¶ 19; *cf. Schuster v. Symmetricom, Inc.*, No. C 94-20024-RMW, 2000 WL 33115909, at *6 (N.D. Cal. Aug. 1, 2000) (market presumed to possess basic information about customer demand for products; dismissing allegations on

1    summary judgment).  Plaintiffs even allege that LeapFrog's stock price declined following

2    PowerTouch's introduction.  SAC ¶ 23.

3          LeapFrog issued numerous disclosures during the Class Period regarding the

4    competition it faced, including specifically warning about competition from the newly-released

5    PowerTouch product from Mattel and warning that the competition would "increase":

6          We currently compete primarily in the infant and toddler and preschool categories and
           electronic learning aids category of the U.S. toy industry and, to some degree, in the
7          overall U.S. and international toy industry. Our SchoolHouse division competes in the
           supplemental educational materials market.  Each of these markets is *very competitive*
8          and *we expect competition to increase in the future*.  For example, *in July 2003, Mattel,*
           *Inc. introduced under its Fisher-Price brand a product called "Power Touch" having*
9          *functionality similar to that of our LeapPad platform.*

10   Ex. 2 at 20 (emphasis added); SAC ¶ 25; *see also* Order at 2 n.1, 3 n.2.  In early October 2003,

11   LeapFrog filed its lawsuit against Mattel alleging that it had already been damaged and would

12   suffer irreparable injury unless PowerTouch's sales were enjoined.  *See* AC ¶¶ 94, 224.[6]

13         That LeapFrog (a) added a second book to its LeapPad in 2003, (b) increased its

14   marketing expenditures, and (c) decreased LeapPad hardware prices in 2004 (*see* SAC ¶¶ 21-

15   22, 28, 30, 40-41) were well-known.  Of course, the extra book and reduced price were on

16   public display at retailers, and the increased advertising expenditures (as well as the actual

17   dollars spent) were reported in each 10-Q and 10-K during the Class Period.  Exs. 2 at 2, 13, 16;

18   6 at 2, 14, 17; 11 at 8, 26, 30, F-4.

19         Thus, given investors' awareness of competition from PowerTouch coupled with

20   LeapFrog's disclosures of increasing competition, Defendants cannot be liable for not saying

21   more about PowerTouch.  *See, e.g.*, *Netflix*, 2005 WL 1562858, at *7 (dismissing claim because

22   defendants warned of impaired earnings if competition was too great); *Steinberg v. PRT Group,*

23   _____

24   [6] Plaintiffs previously alleged that LeapFrog's October 2003 complaint against Mattel
     revealed that LeapFrog immediately lost sales to PowerTouch (AC ¶¶ 93-94), but now allege
25   that the lawsuit revealed nothing (SAC ¶ 31).  Plaintiffs are bound by their prior allegations,
     and cannot evade their previous recognition that the lawsuit disclosed what they contend was
26   fraudulently omitted.  *See Reddy v. Litton Indus., Inc.,* 912 F.2d 291, 296-97 (9th Cir. 1990)
     (plaintiff can only amend complaint to allege facts consistent with prior pleading); *Riggs v.*
27   *U.S.,* No. CV 96-2780 JGD, 1996 WL 756511, at *2 & n.1 (C.D. Cal. Aug. 19, 1996) (taking
     judicial notice of allegation omitted from amended complaint and dismissing complaint);
28   *Barnard v. City of Chicago Heights,* No. 91 C 3626, 1992 WL 309567, at * 5 & n.2. (N.D. Ill.
     Oct. 22, 1992) (taking judicial notice of allegations omitted from amended complaint).

1   *Inc.*, 88 F. Supp. 2d 294, 304 (S.D.N.Y. 2000) (company not liable for failing to disclose lost

2   sales when prospectus warned that business was highly competitive); *In re Syntex Corp. Sec.*

3   *Litig.*, No. 92-20548 SW, 1993 WL 476646, at *7 (N.D. Cal. Sept. 1, 1993) (defendant did not

4   have duty to disclose that its profits would decrease due to pressure from competitors). *See also*

5   *In re DSP Group, Inc. Sec. Litig.*, No. C 95-4025-CAL, 1997 WL 678151 at *6-7 (N.D. Cal.

6   Mar. 5, 1997) (having warned of competition, company had no duty to disclose advantages or

7   success of competitor's product); *In re Sun Microsystems, Inc. Sec. Litig.*, No. C-89-20351-

8   RPA, 1990 WL 169140, at *5 (N.D. Cal. Aug. 20, 1990) ("[a] competitor's announcement of

9   competing products gives rise to no duty to disclose one's own competitive position").

10

11   **2.    Plaintiffs fail to plead adequately a false or misleading statement regarding PowerTouch**

12          While Plaintiffs no longer challenge LeapFrog's 2003 forecasts, they continue to allege

13   that the Company's financial guidance for 2004 was false and misleading because of what

14   Defendants purportedly failed to say regarding the impact of PowerTouch upon LeapFrog's

15   results and future prospects. *See* SAC ¶¶ 42-54.  Plaintiffs also challenge several other

16   statements, including: (1) Mr. Kalinske's September 17, 2003 statement that the introduction of

17   PowerTouch had not impacted LeapFrog's retailer shelf space; (2) Defendants' October 21,

18   2003 statement that LeapFrog's 3Q03 sales miss was due to timing; (3) statements in an analyst

19   report that management was not changing its marketing strategy; (4) Mr. Kalinske's April 21,

20   2004 statement that LeapFrog's tie ratios were improving; and (5) several of Defendants'

21   statements about LeapFrog's gross profit margins. *See id.* ¶¶ 25, 27, 29, 32-33, 35, 43, 47, 49-

22   50, 52-54.  None of these statements is rendered false for not including certain information

23   subsequently articulated at the 2005 patent trial.[7]

24   _____

25      [7] Regarding Mr. Kalinske's September 17, 2003 statement that PowerTouch had not
     negatively impacted LeapFrog "in terms of shelf space," Plaintiffs never allege (because they
26   cannot) that LeapFrog lost retailer shelf space after PowerTouch's introduction. *See* SAC ¶ 29.
     Plaintiffs' claim that Defendants' October 21, 2003 statement attributing the 3Q03 sales miss to
27   timing of sales was false because the miss was actually caused by PowerTouch competition is
     also unsupported. *Id.* ¶¶ 33-34.  Plaintiffs plead no facts indicating the effect of PowerTouch
28   on LeapFrog's 3Q03 sales, and elsewhere allege that the 3Q03 miss was actually caused by
     inability to ship and lack of supply. *Id.* ¶ 90.

No statement was misleading by virtue of LeapFrog not saying more about PowerTouch.  Confronted with the fact that LeapFrog achieved its predicted results for 2003 and even the increased predictions for that fourth quarter, Plaintiffs abandoned any allegations that LeapFrog's financial guidance in 2003 was fraudulent.  *See* SAC ¶¶ 25, 27, 29, 32, 35.  Plaintiffs have not adequately alleged the falsity of any of LeapFrog's forecasts for 2004 at the time they were made.  And Plaintiffs cannot connect LeapFrog's falling short of predictions in 2004 to PowerTouch because even though LeapFrog lost sales to Mattel (as it previously warned and all could see), Plaintiffs again fail to allege that LeapFrog did not factor the impact of PowerTouch into LeapFrog's forecasts.  *See* SAC ¶¶ 42-54.  Without this critical allegation, no statement relating to anticipated financial results can be rendered false by virtue of the well-publicized existence of a competitor's product.  *See In re Foundry Networks, Inc., Sec. Litig.,* No. C 00-4823 MMC, 2003 WL 22077729, at *8, 10 (N.D. Cal. Aug. 29, 2003) (false forecasting claims dismissed; "plaintiffs allege no facts demonstrating that defendants failed to take [allegedly concealed] early shipments into account in issuing Foundry's public revenue and profit forecasts[.]"); *In re Skechers U.S.A., Inc. Sec. Litig.*, No. CV 03-02094 PA, 2004 WL 1080174, at *6 (C.D. Cal. May 7, 2004) (rejecting challenge to earnings projection based on vague accounts of decreasing demand, the complaint "does not contain any factual allegations concerning any particular sale that Defendants knew would not take place or any particular customer planning to purchase fewer Skechers products.").  Plaintiffs cannot credibly contend that the market was unaware that a directly competing product would, in fact, *compete* – particularly in light of the fact that LeapFrog sued Mattel in October 2003.  *See supra* at 13.

Nor does the 2005 patent trial testimony that LeapFrog reduced its hardware prices in January 2004 (SAC ¶¶ 22, 39-40) render any challenged statement false.  Plaintiffs allege that the price reduction undermines LeapFrog's predictions about 2004, but Plaintiffs still cannot plead any contemporaneous facts reflecting that any of LeapFrog's 2004 financial forecasts were unattainable because of the hardware price reduction.  Moreover, here again, the Complaint lacks the critical allegation that the forecasts for 2004 failed to factor in the potential

1   effect of such price reductions. *See id.* ¶ 39.[8]

2        Mr. Bender's patent trial testimony regarding tie ratios – which Plaintiffs continue to

3   mischaracterize notwithstanding the briefing on this issue for the prior motion to dismiss –

4   likewise fails to support Plaintiffs' allegation that Mr. Kalinske's April 21 statements about tie

5   ratios were false. *See* SAC ¶¶ 49-50. Mr. Kalinske's statements were discussing the tie ratio of

6   *all of the LeapPad family products* – and there were four. *Id.* Mr. Bender's comments on

7   declining tie ratios, on the other hand, concern the *classic LeapPad platform only*, as the

8   document Mr. Bender referenced in his trial testimony (omitted from the Complaint) makes

9   clear. *See* Ex. 20. Plaintiffs thus plead no facts indicating that Mr. Kalinske's statement was

10  false when made and, indeed, plead no facts showing that the tie ratio of all the LeapPad family

11  products had ever declined.[9] *See In re Read-Rite Corp. Sec. Litig.*, No. C-03-03148 RMW,

12  2004 WL 2125883, at *5 (N.D. Cal. Sept. 22, 2004) (statements implying adequate liquidity not

13  false given absence of pleaded facts showing contemporaneous existence of liquidity issues).

14       Plaintiffs also challenge Defendants' statement (as reported in an analyst report) that

15  LeapFrog was not changing its marketing strategy in response to PowerTouch because the

16  "truth" was that LeapFrog increased its marketing budget. SAC ¶¶ 24, 27-28, 30. An increase

17  in the marketing *budget*, however, does not render false the analyst's statement that the

18  marketing *strategy* remained unchanged. LeapFrog's SEC filings made clear that the marketing

19  *strategy* included TV and print ads, promotions with retailers and shelf displays (Ex. 11 at 8),

20

21

22      [8] Plaintiffs also allege that LeapFrog had high inventory levels at the end of 2003 and
    contend this rendered false LeapFrog's financial guidance for FY04 because the inventory

23  accumulation "would lead to a dramatic sales decline in 2004[.]" *See* SAC ¶¶ 37-38. Plaintiffs
    fail to allege, however, that these inventory figures were not already factored into LeapFrog's

24  forecasts. *Supra* at 15. Moreover, LeapFrog disclosed the existence of higher-than-expected
    inventories in the retail channel, and Plaintiffs do not challenge the accuracy of any of

25  LeapFrog's inventory data. *See* Ex. 9. In any event, higher inventories are not linked to a sales
    decline unless sell-through is inadequate – and Plaintiffs allege no facts showing that sell-

26  through was inadequate so as to render the level of inventory a problem.

27      [9] Plaintiffs also rely on new allegations by CW17 who purportedly says that LeapPad's tie
    ratio decreased from 2003 to 2004. CW17, however, pointedly limits his assertions to the

28  *classic* LeapPad platform. *See* SAC ¶ 51. Moreover, Plaintiffs allege no facts indicating that
    CW17, who was not hired until June 2004, had personal knowledge of this information. *Id.* ¶ 2.

1  and the SEC filings also disclosed in detail that the total advertising *expenses* increased in 2003.

2  *Id.* at 26, 30, F-4; *supra* at 6.

3        Plaintiffs also inaccurately allege that Mr. Curley lied on February 11 by saying that

4  LeapFrog's 4Q03 gross margin decline was "entirely attributable" to Leapster shipping costs

5  whereas the "true" causes were increased LeapPad marketing expenses and lower LeapPad tie

6  ratios. *See* SAC ¶¶ 43, 44(b).  Mr. Curley, however, never said the gross margin decline was

7  "entirely attributable" to Leapster shipping costs.  Just the day before, LeapFrog's press release

8  disclosed that the lower margins "can be attributed primarily to the lower margin on the sales of

9  the Leapster platform" which "included" the airfreight costs.  Ex. 7.  Mr. Curley honestly and

10  accurately said that LeapFrog "estimated" that Leapster had a negative impact, which "included"

11  shipping costs.  Ex. 8 at 3.  Mr. Curley also elaborated that "advertising expense increased

12  significantly," thereby connecting what Plaintiffs contend is a consequence of increased

13  competition with declining gross margins.  *Id.*  Plaintiffs never allege any facts that support their

14  assertion that the "true" causes of the 4Q03 gross margin decline were PowerTouch, LeapPad

15  marketing expenses, or a declining tie ratio for LeapPad.  SAC ¶ 44(b).  Indeed, the "facts" cited

16  by Plaintiff include Mr. Bender's 2005 trial testimony that LeapFrog reduced LeapPad price in

17  *January 2004* – in other words, *after* 4Q03 had ended and hence, after the price decrease could

18  possibly impact the 4Q03 profit margin.  *Id.* ¶¶ 40-41.

19        Plaintiffs' challenge to LeapFrog's projection in a July 2004 press release that it "expects

20  [LeapFrog's] gross margins to improve in the second half of the year" (*id.* ¶ 53) is also without

21  merit.  Plaintiffs allege that Mr. Bender's trial testimony about tie ratios renders this statement

22  false, but Mr. Bender's testimony does not reflect what LeapFrog's internal projections of gross

23  margin were as of July 21.  *See Brody*, 280 F.3d at 1006.  Plaintiffs also point to a statement by

24  Mr. Bender that LeapFrog estimated it lost sales of 2.9 million books (*id.* ¶ 21), but Plaintiffs do

25  not allege *when* that occurred, much less that at the time they were made, LeapFrog's margin

26  forecasts were unachievable because of the purported lost sales.  *See Vantive*, 283 F.3d at 1086.

27        At bottom, the PowerTouch competition allegations are classic fraud-by-hindsight

28  pleading: they have exaggerated details provided in subsequent trial testimony in an effort to

1   render earlier, often unrelated, statements false by omission.  The law is clear, however, that

2   LeapFrog had no reason, much less any duty, to announce the details elicited at the subsequent

3   patent trial to the financial markets.  *Supra* at 12; *see Brody*, 280 F.3d at 1006.  Especially when

4   viewed against what the market knew and LeapFrog disclosed, Plaintiffs' allegations premised

5   on the purported "concealment" of competition from PowerTouch are inadequate.

6

## IV.   DEFENDANTS MADE NO FALSE STATEMENTS ABOUT LEAPFROG'S OPERATIONS

7

8   Plaintiffs repeat their allegations that LeapFrog failed to disclose that it suffered from

9   operational problems which were known impediments to meeting its forecasts.  *See generally*

10  SAC ¶¶ 55-129.  Despite this Court's Order, Plaintiffs still fail to specify when in relation to the

11  purportedly false statements the purported problems were known; instead, Plaintiffs resort to

12  alleging events occurred "throughout the Class Period" in lieu of pleading actual dates.  *See,*

13  *e.g., id.* ¶¶ 55-71, 80-86, 95, 98, 102-03, 107-120.  Plaintiffs also ignore the fact that LeapFrog

14  repeatedly disclosed to the market that its operations initiatives were not yet complete.

15

### A.   The Alleged Problems with DSS in 2003 and early 2004 Do Not Render Any Challenged Statement False

16

17  Plaintiffs challenge Mr. Wood's October 22, 2003 statements that the shortfall in sales

18  for 3Q03 was "primarily timing," that LeapFrog was now "in position to take the orders that we

19  have and the orders which we're projecting in our guidance" and that LeapFrog had "increased

20  the warehousing and distribution capability for the fourth quarter."  SAC ¶¶ 87-88.  Plaintiffs

21  allege that Mr. Wood's statements were false because the 3Q03 shortfall was due to distribution

22  difficulties, not due to timing, and that LeapFrog had not improved its distribution capabilities.

23  *See id.* ¶¶ 90(a), 90(b).  Plaintiffs, however, fail to plead a single fact disproving the timing

24  issues for LeapFrog back during 3Q03.[10]  Plaintiffs also neglect to account for the fact that

25

---

26      [10] Plaintiffs also challenge the forward-looking October 21 statement that sales not
27  recognized in 3Q03 would be recognized in 4Q03.  *See* SAC ¶¶ 87. 90(a).  But the sole
    allegation that LeapFrog's 4Q03 sales did not, in fact, include sales lost from 3Q03 comes from
28  CW8, who alleges no facts supporting that conclusion.  *Id.* ¶ 90(a).  That LeapFrog achieved its
    upwardly revised forecasts for 4Q03 demonstrates the unreliability of CW8.

1   LeapFrog achieved its financial guidance for 4Q03 and FY03 - even after it increased the

2   estimates for 4Q03 in light of the 3Q03 miss being a timing problem. *See* Ex. 4 at 4; 7 at 1.

3   Not only does this achievement evidence that LeapFrog had indeed improved its distribution

4   capabilities, it also demonstrates that none of LeapFrog's statements during 2003 about its

5   operations were false because these purported operational problems were not severe enough to

6   prevent LeapFrog from making its yearly and even its upwardly revised quarterly numbers.[11]

7          Plaintiffs also claim that LeapFrog's forward-looking financial guidance for FY04 was

8   false because of undisclosed distribution (and supply-chain) problems. SAC ¶¶ 96, 97(a), 99,

9   100(a), 122, 123(a). Plaintiffs do not plead any facts showing the existence of severe

10  operational difficulties around the dates that LeapFrog issued its FY04 guidance (or its revised

11  guidance). Plaintiffs' inability to identify specific facts in support of this claim fails to comply

12  with the requirements of the Reform Act. *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001)

13  ("A company could experience 'serious operational problems' . . . and still have increasing

14  revenues . . . Plaintiffs' complaint was required to allege specific facts that show *how* these

15  'problems' and 'difficulties' *translated into decreasing revenues*.") (emphasis added).

16
          **B.     The Alleged Delays and Problems with FDC in mid-2004 Do Not Render**
17                 **Any Challenged Statement False**

18         Plaintiffs allege that Defendants concealed information about the transition to FDC in

19  2004. *See* SAC ¶¶ 81, 84, 91-92, 95, 97(a), 99, 100-05, 107-29. Based on the alleged

20  undisclosed information, Plaintiffs challenge Mr. Kalinske's March 10, 2004 statements that

21  LeapFrog was "strengthening [its] operations group" and "warehousing and logistics functions"

22  (*id.* ¶ 99); his April 21, 2004 statements that the move into FDC should be completed by the

23  end of 2Q04 (*id.* ¶ 104); and his July 21, 2004 statements that the Company was "continuing to

24

25      [11] Plaintiffs also challenge Mr. Curley's February 2004 statement that LeapFrog's increase
26  in DSOs and receivables for 4Q03 was due to the timing of its sales because, according to
    Plaintiffs, the real cause for the increase was that customers were not paying for products they
27  did not receive or order. SAC ¶¶ 96, 97(c). This allegation is irrelevant since the Court
    dismissed the prior accounting fraud claims. Plaintiffs also fail to plead any facts regarding the
28  timing of LeapFrog's sales in 4Q03 as would be essential to allege adequately that Mr. Curley's
    statement was false.

consolidate our distribution centers and will complete our move into our new warehouse and begin shipping from it at the end of the month" (*id.* ¶ 122).

Plaintiffs' new allegations in support of their FDC-related theory, however, are self-contradictory. For instance, they allege that FDC began receiving product in late July 2004 (*id.* ¶ 114), but then state that inventories were not physically transferred to FDC until September (*id.* ¶ 116). They claim there was no finalized agreement with CLI until July 2004 (*id.* ¶ 117) but also state that LeapFrog and CLI had a contract as of July 1 (*id.* ¶ 84). Plaintiffs also allege that CLI did not begin shipping in July or August (*id.* ¶ 111) but elsewhere allege that CLI was botching its distribution responsibilities throughout July and August (*id.* ¶¶ 114-15).

More significantly, *none of the allegedly undisclosed facts render Mr. Kalinske's statements false.* There are no allegations that CLI's shipping problems occurred before any of Mr. Kalinske's statements, or that any delay in executing a contract with CLI precluded LeapFrog from shipping product out of FDC on the timetable it forecasted. To the contrary, the Complaint alleges that the problems with CLI did not occur until *after* his statements. *See id.* ¶ 114 (FDC only started receiving product in late July / early August). Plaintiffs also admit that the problems with FDC's warehouse management software (HighJump) were not severe since it was "running" by August 2004 and was being "fine tuned" by October. *Id.* ¶¶ 118-19.[12]

Finally, while LeapFrog was under no duty to provide continuous updates on the FDC transition or software development efforts,[13] it nevertheless disclosed in its Form 10-K filed on March 12, 2004, that the expansion was not completed and presented "significant challenges":

---

[12] Plaintiffs also challenge Mr. Kalinske's July 21, 2004 statement that LeapFrog would be maintaining redundancies in shipping capability during the FDC transition. *See* SAC ¶ 122. Plaintiffs allege that "DSS was requiring LF to quickly move inventory out of its warehouses" and that DSS had *prematurely* stopped working for LeapFrog. *Id.* ¶ 123(c) (citing *id.* ¶¶ 82, 107-12). Plaintiffs, however, cannot allege that DSS had already abandoned LeapFrog by July 21, and none of the paragraphs referenced by Plaintiffs contain such an allegation. *Id.* ¶¶ 82, 112, 123(c). Plaintiffs alleges no facts rendering Mr. Kalinske's statement false when made.

[13] *See Applied Signal*, 2006 WL 1050174, at *19 ("Where, as here, a plaintiff's complaint is devoid of the pertinent details and fails to otherwise affirmatively plead the basis for the duty of disclosure, the Court must dismiss the claim."); *In re Pacific Gateway Exchange, Inc. Sec. Litig.*, No. C-00-1211 PJH, 2002 WL 851066, at *17 (N.D. Cal. April 30, 2002) ("No matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not."), *aff'd, Winick v. Pacific Gateway Exchange, Inc.*, [2003-2004 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 92,652 (9th Cir. Aug. 15, 2003).

> We *are upgrading* existing and implementing new operational software systems, including supply-chain management systems.  Further, we *are planning* on consolidating multiple third party distribution warehouses into a single distribution warehouse to handle our needs. *This expansion has presented, and continues to present, significant challenges for our management systems and resources*.  If we fail to develop and maintain management systems and resources sufficient to keep pace with our planned growth, our operating results could suffer.

Ex. 11 at 41 (emphasis added).  On April 21, Mr. Kalinske predicted LeapFrog would complete the move by the end of 2Q04.  SAC ¶ 104.  Five weeks later, LeapFrog disclosed that the warehouse consolidation would not be complete until "*mid*-2004."  Ex. 14 at 24 (emphasis added).  Further, Mr. Kalinske stated on July 21 that the transition into FDC had not yet been completed, and shipping was not expected to begin from FDC until the end of July.  SAC ¶ 122; Ex. 16 at 2.  He also stated then that LeapFrog maintained redundancies because FDC had not yet been fully tested.  *Id.*  LeapFrog subsequently disclosed on August 6 that the consolidation process was still in progress and continued to present "significant challenges."  Ex. 17 at 24.

Because LeapFrog continually and candidly disclosed the progress and challenges it faced with FDC – the very information allegedly concealed – these allegations do not support a securities fraud claim.  *See Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 980-82 (9th Cir. 1999) (affirming dismissal because market knew of allegedly undisclosed information); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1410 (9th Cir. 1996) (same); *In re Metricom Sec. Litig.*, No. C 01-4085, 2004 WL 966291, at *16-18 (N.D. Cal. Apr. 29, 2004) (same).

### C. The Complaint Pleads No New Facts that Would Render False LeapFrog's Statements Concerning The Implementation of Manugistics

Plaintiffs allege that Defendants fraudulently withheld negative information regarding LeapFrog's efforts to implement new supply-chain management software (Manugistics).  *See* SAC ¶¶ 55, 66-68, 71-79, 84, 87-94, 96-107, 117, 120-129.  Plaintiffs, however, ignore that LeapFrog continually revealed the unfinished status of implementing its new supply-chain management systems (just as LeapFrog did for the FDC transition).  The Company disclosed in September 2003 that it had decided to delay its implementation of its new supply-chain systems until 2004.  *Id.* ¶ 78.  On April 21, 2004, Mr. Kalinske stated in the earnings call that,

> We are *in the middle of* our supply planning system implementation, and as I indicated in my notes, that's up and running, and we're working with it.  Now,

1    obviously, when I say that, it is working and people are being trained and *at the
     same time we're utilizing our older system simultaneously* so that we don't have
2    any glitches, but it is running and we're all happy with that. *There are other
     aspects of our supply chain that need to be put into effect.* One is demand
3    planning. That's a custom system that we're working on and that also is very far
     along in its development. And then a purchased allocation planning system that
4    will be up and running *by the end of the second quarter.*

5           * * *

6    Okay. I thought I answered the supply chain one, but I'll try again. We're well
     into this. *I don't know which inning you would call it, but it's certainly not the
     third, maybe it's the 7th,* and we expect that we will be fully operational and
7    utilizing all of these things *at the end of the second quarter*[.]

8    *See* Ex 13 at 9-10, 13 (emphasis added). The following quarter, in the July 21, 2004 earnings

9    call, Mr. Kalinske continued to warn of the "significant challenges" facing all of its operations

10   initiatives. *See* Ex. 16 at 30. The market's awareness of the progress of LeapFrog's operations

11   initiatives precludes liability for Defendants on this issue. *See supra* at 21; *Hillson Partners*

12   *Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204, 206-07, 213 (4th Cir. 1994) ("[a] 'reasonable

13   investor' knows that a capital improvement project may run into unforeseen problems and

14   delays"; upholding dismissal of statements that a capital project was "on schedule" as

15   immaterial and company had no duty to update); *Cutsforth v. Renschler*, 235 F. Supp. 2d 1216,

16   1242-46 (M.D. Fla. 2002) (failure to disclose "severe" operational problems is not actionable

17   unless plaintiffs can show that undisclosed facts rendered other statements misleading).

18          Even aside from these disclosures, Plaintiffs fail to plead any contemporaneous facts

19   showing that LeapFrog's statements regarding its supply-chain software initiatives were false

20   when made. Plaintiffs challenge Mr. Wood's July 24, 2003 statements that LeapFrog

21   "continue[d] to make strong growth in supply-chain;" that the IT director had implemented a

22   supply-chain strategy; that "we all feel good about the successful launch of that improvement

23   for this fall[.]"; and that LeapFrog was "ready to keep customers in stock."[14] *See* SAC ¶¶ 72-

24   73. Even if such "soft" statements could ever be the basis for a securities claim (and they

25

26          [14] Plaintiffs falsely allege that Mr. Wood "stated there were no impediments to reporting
     results in line with guidance." SAC ¶ 72. Mr. Wood's actual response, however, was to agree
27   there were no impediments "in terms of *retail inventory levels* being a little bit higher heading
     into the holiday season." *See id.* (emphasis added). In any event, LeapFrog *met* its FY03
28   guidance. *See supra* at 15, 18.

1   cannot, *see supra* section I.C.), Plaintiffs only make vague, generalized allegations of the lack

2   of supply-chain and warehouse management software (along with some allegations about

3   shipping difficulties at DSS)[15] in an effort to support the falsity of these statements.[16]  SAC ¶¶

4   56-66, 73.  The Complaint does not plead any facts showing that any serious shipping problems

5   existed as of July 24, 2003, rendering Mr. Wood's statements false when made.  *See Ronconi*,

6   253 F.3d at 430, 432 ("any business consists of having problems and dealing with them").

7        Plaintiffs also allege Mr. Curley's September 17, 2003 statement that LeapFrog delayed

8   implementation of Manugistics to avoid disruption to the business was false because the delay

9   ended up disrupting LeapFrog's business anyway.  *See* SAC ¶¶ 78, 79(c).  Plaintiffs claim that

10  this statement is false for the additional reason that the implementation of Manugistics in 3Q04

11  would eventually cause greater disruption than installing the software in 3Q03.  *See id.*

12  Plaintiffs plead no facts indicating that as of September 2003, LeapFrog had already made the

13  decision to install Manugistics in 3Q04 (as opposed to 1Q04 or 2Q04).  Further, even if it could

14  be shown with the benefit of hindsight that LeapFrog underestimated the difficulties of

15  implementing the complex new Manugistics system, that error does not make Mr. Curley's

16  earlier statements false.[17]  *See Ronconi*, 253 F.3d at 433.

17       In addition, Plaintiffs allege that Mr. Kalinske's vague March 10, 2004 statement that

18  LeapFrog was "strengthening" its supply-chain management systems was false because of

19  undisclosed problems in implementing the software.  *See* SAC ¶¶ 99, 100(b).  The Complaint,

20  _____

21  [15] Plaintiffs allege that LeapFrog experienced "severe problems" in its Genco facility.  SAC
    ¶¶ 64-65.  Plaintiffs, however, do not allege that LeapFrog made any statements regarding

22  Genco.  There are also no facts specifying when these problems occurred, which customers were
    impacted, or the financial impact of any problems.  *Vantive*, 283 F.3d at 1086-87.

23  [16] Plaintiffs make the odd accusation that these statements are false because of an
    undisclosed late product development cycle.  SAC ¶¶ 69-70, 73.  Plaintiffs never explain the

24  relationship, if any, between these allegations and LeapFrog's product development cycle, and
    also fail to specify when these delays occurred, by how much products were delayed, or even

25  what a "product development process" is supposed to mean.

26  [17] Plaintiffs also attack Mr. Kalinske's September 17, 2003 statements that LeapFrog
    expected growth and that LeapFrog was a "financially disciplined" company.  SAC ¶ 78.

27  Plaintiffs claim that the "financially disciplined" comment was false because LeapFrog
    announced it had material weaknesses in its internal controls *in 2005.  See id.* ¶ 79(b).  This

28  argument represents an underhanded attempt by Plaintiffs to resurrect their accounting claims,
    which this Court dismissed with prejudice.

however, fails to plead any contemporaneous facts reflecting that, as of March 2004, LeapFrog was not actually making progress in strengthening their supply-chain.  Even if Plaintiffs' allegations are true and Manugistics was completely inoperational, this statement is still not false because Plaintiffs do not dispute that LeapFrog was trying to install new supply-chain software, such that LeapFrog was "strengthening" its systems.

Plaintiffs also challenge Mr. Kalinske's forward-looking statement on April 21 that the Company's systems initiatives were "on track to be fully operational at the end of the second quarter, and our new supply-chain management system is up and running as we speak" (SAC ¶ 104) and his statements on July 21 that some additional portions of the system were "up and running" (*id.* ¶ 122).  Plaintiffs allege the delays and problems in installing the software render these statements false.  *See id.* ¶¶ 105(a), 123(b).  Plaintiffs depend on the discredited CW8 and CW12's apparent claims that no *WMS* (*i.e.*, HighJump – not Manugistics) software was "up and running" as of April 2004 (*id.* ¶ 102), CW1's purported testimony that LeapFrog had not "implemented supply-chain software" as of 6/04 (*id.* ¶ 107), that delays in finalizing the CLI contract "made it impossible for CLI and LF to get LF's logistics and supply-chain operations running until after the 2004 peak selling season began" (*id.* ¶ 110), CW5's statements that FDC had no *properly*-running supply-chain software" in July 2004 and that Manugistics "never worked" and "was still not operating as it was supposed to" by 1Q05 (*id.* ¶¶ 117, 120).[18]

Notwithstanding LeapFrog's concurrent disclosures that the Company was still relying on manual processes and was not expected to complete its supply-chain upgrades until the end of 2Q04 (*supra* at 21-22), none of these conclusions and opinions contradicts Mr. Kalinske's statements.  Tellingly, CW8 and CW12 have only offered their opinions as to whether

---

[18] Plaintiffs plead no facts to indicate how CWs 1, 5, 8 or 12 would be in any position to report knowledgeably on the installation of supply-chain software during July 2004.  *Tibco*, 2006 WL 1469654, at *22.  *In re Business Objects SA Sec. Litig.*, No. C 04-2401 MJJ, 2005 WL 1787860, at *6 (N.D, Cal. July 27, 2005).  CW1 was an "allocations analyst" who left LeapFrog in June 2004.  SAC ¶ 2.  CW5 was only a contract employee who did not join LeapFrog until July 2004, making it impossible for him to have contemporaneous knowledge of relevant facts surrounding the April 2004 statement.  *Id.*  CW8's job title bears no relation to information technology issues.  *Id.*  Finally, CW12 is not even a LeapFrog employee, worked in Southern California, and left his employment in April 2004.  *Id.*

1  *HighJump* was "up and running" as of April 2004.  SAC ¶ 102.  Neither CW8 (a director of

2  international distribution) nor CW 12 (a Genco facilities manager) is alleged to have worked on

3  the *Manugistics* implementation in any way.  *Id.* ¶ 2.  The Complaint alleges *no* facts as to the

4  state of the Manugistics implementation as of the time of Mr. Kalinske's statements, let alone

5  any particularized facts reflecting that Mr. Kalinske's statements, when viewed in context with

6  his other statements that the implementation was ongoing (*i.e.,* LeapFrog was still testing

7  Manugistics), created a state of affairs that differed materially from that which actually existed.

8  *See Brody*, 280 F.3d at 1006.  Nor do Plaintiffs explain what it means to not "implement" the

9  software or have software that is not "properly-running" or "up and running."

10  **V.   PLAINTIFFS FAIL TO PLEAD SPECIFIC FACTS CREATING A STRONG
         INFERENCE OF SCIENTER**

12         As explained in the Individual Defendants' Motion to Dismiss, plaintiffs not only fail to

13  allege facts sufficient to create a strong inference of scienter (15 U.S.C. § 78u-4(b)(2)), but their

14  allegations actually make any inference of scienter implausible.  Ind. Mot. at 7, 9.

15                                     **CONCLUSION**

16         For the foregoing reasons, the Second Amended Complaint should be dismissed.

17  Despite having multiple opportunities to amend, Plaintiffs remain unable to state a claim.  The

18  Court should therefore dismiss Plaintiffs' complaint with prejudice.  *Lipton*, 284 F.3d at 1038-

19  39 (once-amended complaint dismissed with prejudice); *Applied Signal*, 2006 WL 1050174, at

20  *22-23 (same); *In re Netflix Inc. Sec. Litig.*, No. C 04-2978 WHA, 2005 WL 3096209, at *1

21  (N.D. Cal. Nov. 18, 2005) (same).

                                   Respectfully submitted,

Dated:  November 22, 2006          WILSON SONSINI GOODRICH & ROSATI
                                   Professional Corporation


                                   By:   ___/s/ Leo P. Cunningham_____
                                         Leo P. Cunningham

                                   Counsel for Defendants LeapFrog Enterprises,
                                   Inc., Timothy M. Bender, James P. Curley,
                                   Thomas J. Kalinske and Michael C. Wood