United States District Court
For the Northern District of California

**E-FILED on** 9/30/07

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re LEAPFROG ENTERPRISES, INC. SECURITIES LITIGATION,<br><br>This Document Relates To:<br><br>ALL ACTIONS. | No. C-03-05421 RMW<br><br>ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS<br><br>**[Re Docket Nos. 228, 229]** |

Plaintiffs' Second Amended Consolidated Class Action Complaint ("SAC") alleges violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 against defendant LeapFrog Enterprises, Inc. ("LeapFrog") and four of LeapFrog's officers or former officers.[1] LeapFrog moves to dismiss the SAC for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). The individually-named officers of LeapFrog filed a separate motion also seeking to dismiss the SAC for failure to state a claim. LeapFrog and the individual defendants join in each other's motion. Plaintiffs oppose the motions. Plaintiffs also seek leave to amend in the event defendants' motions are granted. The court has read the moving and responding papers and considered the arguments of counsel. For the reasons set forth below, the court GRANTS defendants' motions to dismiss.

[1] It appears that LeapFrog officers James L. Marggraff, Mark B. Flowers, Robert W. Lally, and Paul A. Rioux are no longer named as defendants in the SAC.

Plaintiffs have twenty (20) days from the date of this order to amend their complaint.

## BACKGROUND

### A. The Parties and Claims

Lead plaintiffs Parnassus Fund and the Parnassus Equity Income Fund (together, "plaintiffs") filed a securities class action individually and on behalf of a class of persons who purchased LeapFrog class A common stock and options between July 24, 2003 and October 18, 2004 (the "Class Period"). LeapFrog designs, develops, and markets technology-based educational toys. SAC ¶ 5. LeapFrog's flagship product is the LeapPad® system, which it introduced to the market in 1999. ¶ 18. The LeapPad system includes the LeapPad electronic platform and LeapPad content books used with the electronic platform. *Id.* LeapFrog stock is traded on the New York Stock Exchange.

The SAC also names four of LeapFrog's officers (or former officers) as defendants. Defendant Michael C. Wood ("Wood") founded LeapFrog in 1995 and served as its president and vice chairman since September 1997. *Id.* ¶ 6. Wood also served as chief executive officer ("CEO") from March 2002 to February 2004 and as chief vision and creative officer from February 2004 to September 2004, when he left the company. *Id.* Defendant Thomas J. Kalinske ("Kalinske") has served as chairman of LeapFrog's board of directors since September 1997. *Id.* ¶ 7. Kalinske also served as CEO from September 1997 to March 2002. In February 2004, Kalinske resumed the position of CEO. Defendant James P. Curley ("Curley") served as chief financial officer ("CFO") from December 1991 to November 2004. *Id.* ¶ 8. Defendant Timothy M. Bender ("Bender") has served as president of LeapFrog's Worldwide Consumer Group since January 2002. *Id.* ¶ 9. Prior to that Bender served as senior vice president of sales and marketing and vice president of sales. *Id.*

Plaintiffs allege two claims for relief. First, plaintiffs contend LeapFrog and each of the individually-named defendants violated section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"). Second, plaintiffs contend that each of the individually-named defendants acted as control persons of LeapFrog within the meaning of section 20(a) of the Securities Exchange Act of 1934 and are liable thereunder.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

**B. Allegations Regarding Competition From PowerTouch**

Plaintiffs allege that defendants made false and misleading statements and concealed material adverse information about (1) the negative effects of the then newly-introduced competing Mattel, Inc. ("Mattel") PowerTouch product on its flagship LeapPad product sales, and (2) the "severe" supply chain and distribution problems experienced by LeapFrog. *Id.* ¶ 1. Plaintiffs allege that until July 2003 LeapFrog's flagship LeapPad products faced no significant competition. *Id.* ¶ 18. In July 2003 Mattel launched its "PowerTouch" product which plaintiffs allege is a similar type of toy that competes with the LeapPad system. *Id.* ¶ 19. During the two weeks after PowerTouch's introduction, LeapFrog's stock price declined four points. *Id.* ¶ 23. On August 11, 2003 LeapFrog warned that it competes in very competitive markets and that Mattel Inc. had introduced the Power Touch which had functionality similar to the LeapPad platform. *Id.* ¶ 25.

LeapFrog sells its LeapPad products primarily to retailers. *Id.* ¶ 18. During the Class Period its three largest retail customers were Wal-Mart, Target, and Toys 'R Us. *Id.* Customer requirements are fulfilled as orders come in from these retailers. LeapFrog's annual sales grew rapidly prior to the class period. *Id.* Reported annual net sales were $160.1 million in 2000, $314.2 million in 2001, $531.8 million in 2002, and $680.0 million in 2003. *Id.* LeapFrog's annual sales for 2004 were $640.0 million. LeapFrog also tracked its "tie ratio" which is the ratio of content books sold to electronic platforms sold.[2] The tie ratio for the LeapPad was 1.6 in 2000, 2.4 in 2001, 3.9 in 2002, 3.7 in 2003, and 2.9 in 2004. *Id.* ¶ 21. In January 2004 LeapFrog lowered prices on its LeapPad products due to competition from the PowerTouch. *Id.* ¶ 40.

In October 2003 LeapFrog filed a patent infringement suit against Mattel. *Id.* ¶ 19. During the trial in May 2005, Bender testified that based on his tracking of sales of the PowerTouch compared with sales of the LeapPad, "once the PowerTouch was introduced, and it was merchandised right next to the LeapFrog products, we immediately saw a depress in our sales on the hardware of LeapPads and My First LeapPads." *Id.* The trial testimony also indicated that

---

[2] Each electronic platform has a library of content books that may be used with it. When the LeapPad was first launched, it was sold with one content book. Because Mattel's PowerTouch was bundled with two content books, LeapFrog began bundling the LeapPad with two content books due to competition from the PowerTouch. ¶¶ 98, 103.

LeapFrog "drastically reduced" prices of LeapPad platforms in January 2004 and lost sales of one to two million LeapPad platforms and between 2.8 - 2.9 million content books. *Id.* ¶¶ 20, 21, 40.

**C. Allegations Regarding Supply Chain and Distribution**

Plaintiffs allege that LeapFrog's distribution and supply-chain infrastructure and related information technology systems were "rudimentary and inadequate" and were negatively impacting LeapFrog's ability to distribute products to its customers and to forecast product needs and financial results. *Id.* ¶ 55. LeapFrog relies primarily on third-party logistics suppliers to handle the distribution operations from its warehouses. *Id.* Plaintiffs allege that during the Class Period defendants knew that LeapFrog "had numerous problems with third party logistics suppliers not delivering products on time to customers." *Id.* Plaintiffs contend that throughout 2003 and through July 2004, DSS, one of the third-party logistics suppliers, failed to ship ordered products, shipped products late, or shipped the wrong product. *Id.* ¶ 56. Plaintiffs allege that problems with Genco, another supplier, included damaged products and packaging, lost products, severe problems with late deliveries, temporary employees who did not care about their work performance, an employee who ruined products by stabbing boxes, truckers who refused to take products, reliance on non-LeapFrog truckers, mixed up paper work, and general confusion. *Id.* ¶ 64.

Plaintiffs allege that through until at least June 2004 LeapFrog did not have an enterprise-level system for forecasting supply and production requirements, but needed such a system. *Id.* ¶ 66. This resulted in insufficient products to meet shipment requirements for orders and an inability to allocate inventory to key retail customers. *Id.* ¶¶ 66-67. Management also made decisions that resulted in increased costs. *Id.* ¶¶ 69-70.

According to the complaint, LeapFrog management received a summary spreadsheet on a daily basis with information of daily and cumulative shipping and sales figures and forecasts, including information about open orders. *Id.* ¶ 71. Each morning there was a meeting to discuss "shipping and sales figures and related issues," including shipping and logistical problems, lost sales, and orders needed to meet projections. *Id.* The spreadsheet was emailed and posted on an internal website accessed by top management. *Id.* Wood, Kalinske, and Bender attended two to three times a week, Curley attended ten to fifteen times a month. *Id.* Plaintiffs also allege that

according to confidential witnesses, it was well known throughout the company that the third-party logistics suppliers were having problems shipping and meeting order requirements, that there were shipping issues, the continued reliance on a rudimentary supply-chain infrastructure as the new supply-chain system was being implemented impeded performance, and it was well known throughout LeapFrog that the supply-chain software was not working. *Id.* ¶¶ 64, 73, 77, 107.

**D. Allegations Regarding Insider Stock Sales**

Plaintiffs also point to sales of LeapFrog stock by the individually named defendants during the Class Period, alleging that the sales were "suspicious in timing and amount" and noting that the sales by Wood and Kalinske were "dramatically out of line with their sales prior to the Class Period. *Id.* ¶¶ 6, 7, 11, 12-13.

## II. LEGAL STANDARD

To determine whether a private securities fraud complaint can survive dismissal under Federal Rule of Civil Procedure 12(b)(6), the court must determine whether particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or with deliberate recklessness made false or misleading statements to investors. *In re Read-Rite*, 335 F.3d 843, 846 (9th Cir. 2003); *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001). "The PSLRA altered the pleading requirements for private litigants by requiring that a complaint plead with particularity both falsity and scienter." *America West Holding* ("*America West*"), 320 F.3d 920, 931 (9th Cir. 2003). To survive the higher pleading standards required by the PSLRA, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." 15 U.S.C. § 78u-4(b)(1); *Am. West*, 320 F.3d at 931.

The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The dual pleading requirements of §§ 78u-4(b)(1) and (b)(2) are incorporated into a single inquiry, because falsity and scienter are generally inferred from the same set of facts. *Read-Rite Corp.*, 335 F.3d at 846; *Ronconi*, 253 F.3d at 429. If a plaintiff fails to plead either the alleged misleading statements or

scienter with particularity, his or her complaint must be dismissed. *See Am. West*, 320 F.3d at 931-32; § 78u-4(b)(3)(A). The court considers the totality of the plaintiffs' allegations and all reasonable inferences to be drawn from the allegations, whether favorable or unfavorable. *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005) (amended decision). The Supreme Court has recently clarified that "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499 (June 21, 2007).

## III. ANALYSIS

Defendants argue, *inter alia*, that plaintiffs' claim that defendants violated securities laws based on misstatements and omissions regarding competition from the PowerTouch product fails because plaintiffs cannot plead the requisite element of loss causation as to such claim, (2) that plaintiffs' claim that defendants violated the securities laws through misstatements and omissions regarding the supply-chain and distribution implementation fails to state a claim because plaintiffs do not sufficiently plead with particularity that plaintiffs made statements with scienter, and (3) many of plaintiffs' alleged false and misleading statements are not actionable under the securities laws. The court addresses these arguments in turn.

### A. Pleadings Regarding Competition from PowerTouch

Defendants argue that plaintiffs have failed to plead a causal connection between any misleading statements about competition from PowerTouch and the stock price drop that purportedly caused their losses. Specifically, defendants contends, the purported disclosure in LeapFrog's October 18, 2004 press release did not disclose anything regarding sales lost due to competition from the PowerTouch. To state a Rule 10b-5 claim, "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4); *In re Daou Sys.*, 411 F.3d at 1014. To establish loss causation plaintiffs must show that the stock price dropped after the truth was "revealed." Plaintiffs need only meet the pleading requirements of Fed. R. Civ. P. 8(a) as to the loss causation element of a § 10(b) claim. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346 (2005).

In *Dura Pharmaceuticals*, 544 U.S. at 347, the Court held that loss causation was not stated because the complaint failed to claim that Dura's share price fell significantly after the truth became known. The Court observed that the purpose of the federal securities laws is "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Id.* at 345. In *In re Daou Systems*, 411 F.3d at 1025, the Ninth Circuit held that "to prove loss causation, the plaintiff must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff." The Ninth Circuit found that although the plaintiffs did not allege any disclosures of improper accounting practices at the time the stock price dropped, the plaintiffs did allege that "Daou's stock fell precipitously after defendants began to reveal figures showing the company's true financial condition." *Id.* at 1026. The court found that loss causation had been pled because "the drop in Daou's stock price was causally related to Daou's financial misstatements reflecting its practice of prematurely recognizing revenue before it was earned." *Id.* However, loss causation was not adequately pled as to the portion of the class period for which there were no alleged "revelations" of Daou's true financial health.

As in *Daou*, plaintiffs fail to cite any disclosing events "revealing" any previous misstatement or concealed "truths" as to the PowerTouch during the Class Period. *See also In re Applied Signal Tech. Inc. Sec. Litig.*, 2006 WL 1050174, *20-22 (N.D. Cal. Feb. 8, 2006) (Armstrong, J.). Plaintiffs allege that there were "partial disclosures" resulting in stock declines on October 22, 2003, February 10, 2004, and March 10, 2004, but because the purported partial disclosures did not reveal the full extent of LeapFrog's "problems," and "were accompanied by false and misleading positive assurances," the stock price remained inflated. SAC ¶ 137. However, plaintiffs do not point to any specific disclosure or anything specific in the public disclosures preceding these stock declines. The court does not find that the disclosures preceding these declines in stock prices make any mention of lower than expected financial results due to previously undisclosed competition from the PowerTouch.

In the October 21, 2003 press release LeapFrog announced that (1) net income was up 25% for the third quarter and 102% year-to-date, (2) net sales were up 12% for the third quarter and 23%

year-to-date, and (3) net sales were up in specific segments over the prior year. Decl. of Daniel Turbow Supp. Defs.' Mot. Dismiss SAC ("Turbow Decl."), Ex. 4.[3] LeapFrog also stated that "late building demand from our key retailers resulted in lower net sales growth for the third quarter . . . . This resulted in a shift of deliveries from the third quarter to the benefit of the fourth quarter." *Id.* Finally, LeapFrog increased its guidance for the fourth quarter of 2003 and reaffirmed its guidance for the full year. *Id.* The February 10, 2004 press release announcing 2003 financial results noted increases in net sales, net income, and market share for 2003. The press release also disclosed that gross margin fell from 50.8% for 2002 to 50.0% for 2003 because of the introduction and sales of a lower margin product, the Leapster, which the company began selling in October 2003. In the March 10, 2004 press release LeapFrog issued guidance for the first quarter of 2004, including a projected net loss due to increased gross margins and continued expenditures in research and development and supply-chain initiatives. Turbow Decl., Ex. 10. LeapFrog also stated that the first quarter is particularly vulnerable to trends that impact net sales, margins, and net income, such as the shifting of retail orders to later in the year by retailers. *Id.* None of these disclosures provides a basis for a causal link between a decline in stock price and the purported misleading and false statements regarding competition from the PowerTouch.

Plaintiffs aver that on October 18, 2004 LeapFrog "admitted that distribution and supply-chain problems and soft LeapPad sales due to market conditions would cause [LeapFrog] to report [third quarter 2003] results significantly less than [previous] guidance." *Id.* ¶ 138. LeapFrog's stock

---

[3] Defendants' request judicial notice of the exhibits attached to the Turbow Decl. on the basis that these exhibits are the press releases, earnings calls transcripts, SEC filings, and analyst reports referenced in and quoted from in the SAC. Plaintiffs object to defendants' request to the extent it seeks the court to "take judicial notice of irrelevant facts or take judicial notice of the truth of disputed facts." The court does not read defendants' request as asking the court to take judicial notice of irrelevant facts or of the truth of the matters contained in the submitted exhibits. See Defs.' RJN at 2:12-15. Rather, plaintiffs' dispute appear to be with the arguments defendants' make in reliance on some of the submitted documents. See Pls.' Opp'n to Defs.' RJN at 3:21-21, 4:23-5:19. By granting defendants' request for judicial notice, the court does not purport to accept defendants' interpretation of the matters therein. The court hereby grants defendants' request for judicial notice as to the contents in the documents attached as Turbow Decl., Exs. 1-19. *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (A court may consider documents whose authenticity is not contested and on which plaintiff's complaint necessarily relies.); *see also Kuehbeck v. Genesis Microchip Inc.*, 2005 WL 1787426, *4 (N.D. Cal. 2005) (White, J.) (granting request for judicial notice of press releases, earnings call transcripts, and SEC filings referenced in the complaint). The court also grants defendants' request for judicial notice of plaintiffs' First Amended Complaint filed in this action, which plaintiffs did not object to.

then "collapsed" and the artificial inflation was removed from the stock price. *Id.* The October 18, 2004 press release provided a revised outlook for 2004 and preliminary results for the third quarter of 2004. LeapFrog disclosed:

> The operating climate in the United States is tougher than we anticipated, and we expect to see this continue through the Holiday season. . . . In addition, we are experiencing softness in our basic LeapPad business in the United States, and we have had several challenges getting our new distribution center and supply-chain systems up and running smoothly during this peak season.
>
> ***
>
> While we had a more optimistic view of the second half of the year three months ago, we believe that 2004 will be less profitable than we had previously expected.

Turbow Decl., Ex. 18 at 1.

Plaintiffs' contention that the October 18, 2004 disclosure of a tougher operating climate impacting its profits and sales provides the causal link to defendants' alleged misrepresentations and omissions regarding competition from Mattel is without merit. The disclosure is that the operating climate in the United States for the remainder of 2004 "is tougher than anticipated" and there is softness in the basic LeapPad business. According to disclosures in the earnings call held the same day, LeapFrog attributed the softness in the basic LeapPad business to the mature status of that product compared to other products in the LeapPad family, and not to competition from Mattel (Fisher-Price). Turbow Decl., Ex. 19. LeapFrog disclosed that the tougher operating climate referred to unanticipated increases in costs of commodities and an industry-wide decline in toy sales. *Id.*[4] Plaintiffs' SAC provides no factual allegations supporting a conclusion that the cause of the "tougher operating climate" in the fourth quarter of 2004 is the introduction of a competing product by Mattel in July 2003. Therefore, plaintiffs have not pled loss causation to meet even the pleading requirements of Fed. R. Civ. P. 8(a). *See Dura Pharms.*, 544 U.S. at 346 (applying the pleading standard of Rule 8 for the loss causation element of a Section 10(b) claim).

---

[4] Plaintiffs argue that the court is not bound by these "self-serving" explanations by defendants about what caused the lower results and what they meant by "tough operating climate" and "softness" in LeapPad sales. However, in assessing whether causation has been properly pled the court is bound by what has been disclosed to the market. *See Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988) (noting that "the market price of shares traded on well-developed markets reflects all publicly available information"). A highly efficient market incorporates all publicly available information into the market price. *Id.*

United States District Court
For the Northern District of California

**B. Pleadings Regarding Supply-Chain and Warehouse Distribution**

Plaintiffs allege that throughout the Class Period defendants experienced significant difficulties with shipping products due to the (1) poor decisions by management to delay manufacturing production orders, (2) poor performance by the third-party logistics suppliers used by defendants, (3) poor decisions by management in timing the conversion to a consolidated warehouse and new supply-chain and distribution software close to the peak selling season, and (4) significant challenges faced by management in getting the new supply-chain and distribution system up and running smoothly during the peak selling system.

The court noted in its July 31, 2006 Order Granting Defendants' Motions to Dismiss ("July 31, 2006 Order") that plaintiffs' First Amended Complaint failed to allege with particularity facts indicating the falsity of statements at the time they were disclosed and that defendants knew or were deliberately reckless with respect to knowing of the falsity of such statements when made. *See, e.g.*, July 31, 2006 Order at 2:21-3:13. Plaintiffs' allegations in the SAC again do not meet the PSLRA's heightened pleading standards requiring that falsity be pled with particularity and that specific facts be plead showing a strong inference of scienter at the time the purported statements or omissions were made. In particular, plaintiffs' allegations purporting to show defendants made false and misleading disclosures with scienter are largely vague, made without specific reference to time, or provide no indication of knowledge of falsity by the particular defendant alleged to have made the statement. For example, plaintiffs allege (1) "[r]egular conference calls through at least 2003, attended by Rioux and Curley's report, Murrer, discussed shipping issues at Genco," SAC ¶ 64; (2) defendants knew that the ongoing infrastructure and shipping problems were dramatically impeding performance because "throughout 2003, 3PLs frequently delinquently shipped product to customers," "from at least 3/03, [LeapFrog's] controller was sent monthly reports of substantial cost overruns due to coordination problems between 3PLs," and "lack of supply chain software from prior to 3Q03 caused insufficient inventory to meet demand," *id.* ¶ 77; and (3) "[i]t was well known throughout [LeapFrog] that the software was not working," *id.* ¶ 107.

Plaintiffs also allege that LeapFrog management received a summary spreadsheet on a daily basis with information of daily and cumulative shipping and sales figures and forecasts, including

United States District Court
For the Northern District of California

information about open orders. *Id.* ¶ 71. Each morning there was a meeting to discuss "shipping and sales figures and related issues," including shipping and logistical problems, lost sales, and orders needed to meet projections. *Id.* The spreadsheet was emailed and posted on an internal website accessed by top management. *Id.* Wood, Kalinske, and Bender attended two to three times a week, Curley attended ten to fifteen times a month. *Id.* These allegations are insufficient to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" at the time any particular alleged false and misleading statement was made.

Other allegations purporting to support a showing of scienter at the time the alleged false and misleading statements were made are entirely conclusory or conflate a purported showing of falsity with a showing of requisite scienter. For example, plaintiffs allege "[t]he statements in the 10/21/03 press release and 10/22/03 conference call were false and misleading for the reasons set forth in ¶¶ 73-86, and because, *inter alia*, as [d]efendants knew: . . . Wood's representations that the reason for the 3Q03 sales miss was 'primarily timing' was false and misleading because the shortfall was primarily caused by, *inter alia*, the inability of [LeapFrog's] 3PLs to ship correct products to [LeapFrog's] retailers within required shorter time periods and [LeapFrog] not having sufficient amounts of product available to fill customer orders."[5] *Id.* ¶ 90. Plaintiffs' allegation that "[d]efendants knew that their FY04 guidance could not be met because, *inter alia*, distribution and supply chain problems and delays were causing [LeapFrog] to lose millions of dollars of sales and profits and to incur additional expenses, and the delays assured that [LeapFrog] would undergo its warehouse, 3PL, and systems transition at the worst possible time," *id.* ¶ 97(a), likewise is conclusory as to scienter and conflates the purported showings of falsity and scienter.

In addition, plaintiffs make a substantial number of allegations that LeapFrog's supply-chain infrastructure was inadequate and that its third-party logistics providers had numerous problems and issues shipping products properly or timely. *See, e.g., id.* ¶¶ 56-62. As the court in *Ronconi*, 253 F.3d at 430, observed, "[m]uch of any business consists of having problems and dealing with them." *Id.* at 430. The allegations indicate that throughout the second half of 2003 and into 2004 LeapFrog

---

5 In addition, plaintiffs cite to "CW4, CW8" to support these allegations, but there does not appear to be any allegations of statements by these confidential witnesses in support of a showing of scienter on defendants' part.

disclosed that it was working on improving its supply-chain and distribution process by, *inter alia*, consolidating its distribution warehouses and implementing new software. The most concrete alleged misstatement that plaintiffs point to regarding the progress of LeapFrog's supply-chain improvements is Kalinske's April 21, 2004 statements. Kalinske stated that LeapFrog was "implementing supply-chain management systems in a new consolidated warehouse," "all aspects of these initiatives are on track to be fully operational at the end of the second quarter," and "our new supply-chain management system is up and running as we speak." Plaintiffs point to statements by confidential witnesses that the system was "far from operational" in April 2004 and that shipments were only beginning to be made on the new system in July 2004. Nevertheless, the allegations, viewed in context, do not support a strong inference of scienter to mislead. In the same press release, and again during the earnings call that day, LeapFrog also stated that it was still actively engaged in improving its operations and systems infrastructure and one business initiative the company will focus on is improving its internal systems for supply-chain and information technology.[6] Taken as a whole, these allegations indicate that the implementation initiatives were ongoing and, although management is optimistic, the transition was not as smooth and quick as originally anticipated. *See Ronconi*, 253 F.3d at 433.

**C. False and Misleading Statements**

Although the court has concluded that plaintiffs have failed to state a claim that defendants violated § 10(b) either on the basis of alleged misstatements or omissions concerning competition from the PowerTouch or alleged misstatements or omissions regarding supply-chain and distribution problems, the court will further address the issue of whether some of the alleged false and misleading statements may serve as grounds for a securities fraud claim. Here, defendants argue that many of the statements plaintiffs allege are false and misleading are not actionable because (1) they are forward-looking statements accompanied by adequate cautionary statements, (2) the statements are risk factor disclosures that may not be actionable as affirmative misstatements, (3)

[6] In addition, according to the SAC, on October 24, 2003, an analyst issued a report based on a meeting with Kalinske in which "management highlighted 2 key sources of the shortfall: (1) poor forecasting of 3Q03 orders based on 3Q02 strength in the face of the dockworkers' strike . . . , and (2) problems in managing distribution and logistics." SAC ¶ 91.

they constitute general expressions of optimism, or (4) they are statements made by analysts.

**1. Forward-Looking Statements**

Defendants argue that the following statements alleged to be false and misleading regarding the competition from the PowerTouch are forward-looking: (1) statements in the February 10, 2004 press release and February 11, 2004 earnings call providing fiscal year 2004 guidance, SAC ¶¶ 42-43; (2) statement in the March 10, 2004 press release that sales for the first quarter of 2004 were expected to be $66 - $72 million compared to the previous forecast of $80 - $85 million, *id.* ¶ 45; (3) statements in the April 21, 2004 press release and earnings call that net sales for fiscal year 2004 were expected to be $770 - $800 million and gross margin was expected to be 48 - 49%, lower than previously disclosed guidance, *id.* ¶¶ 49-50; and (4) statement in the July 21, 2004 press release that the company expected improvement in gross margins for the second half of the year "as new software titles become increasingly available and software sales comprise a larger portion of the company's total sales mix," *id.* ¶ 53. Plaintiffs dispute that the statements identified by defendants are forward-looking because "they involve subject matter 'firmly lodged in the present.'"

Forward-looking statements include financial projections, future management plans and objectives, statements of future economic performance, as well as any statement of the assumptions underlying any of the foregoing. 15 U.S.C. § 78u-5(i)(1). Statements of present or historical facts are generally not considered forward-looking. *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 403 F.3d 1050, 1056-57 (9th Cir. 2005). However, a present tense statement can be considered forward-looking "as long as the truth or falsity of the statement cannot be discerned until some point in time after the statement is made." *Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir.1999); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1067 (N.D. Cal. 2001). Historical statements can also be forward-looking if they are presented as factors underlying a projection or economic forecast. *Id.* at 807.[7]

Here, each of the financial forecast statements identified by defendants as forward-looking falls squarely within 15 U.S.C. § 78u-5(i)(1)(A)-(D) as each is a statement predicting the company's

---

[7] The SAC does not distinguish between forward-looking statements, which require a different state of mind to be pled.

future expected sales or other financial results.  Section 78u-5(i)(1)(A)-(D) provides that forward-looking statements include (1) a statement "containing a projection of revenues, income, . . . earnings per share, capital expenditures, dividends, capital structure, or other financial items"; (2) a statement "of the plans and objectives of management for future operations"; (3) a statement predicting "future economic performance"; or (4) a statement containing "assumptions underlying or relating to" any of the above enumerated statements.  Plaintiffs rely upon *South Ferry LP #2 v. Killinger*, 399 F. Supp. 2d 1121, 1131 (2005), for the proposition that statements "that are grammatically about the future but whose subject matter is firmly lodged in the present" are not considered forward-looking.  However, the *South Ferry* court expressly found that statements such as the ones identified here by defendants were forward-looking.  *See id.* at 1134 ("[B]ecause the statement refers to future economic performance, the Court finds that the statement is 'forward looking' within the meaning of the statute.").[8]

The court also concludes that many of the statements alleged to be false and misleading statements regarding the supply-chain and distribution operations are forward-looking for the same reasons discussed above.  Specifically, the following are forward-looking: (1) the statement in the March 10, 2004 press release regarding revised expected financial results for the first quarter of 2004, *id.* ¶ 99, which was discussed above; (2) the statement in the March 10, 2004 press release that LeapFrog expects the investments in a supply-chain management system and warehousing and logistics functions "will lead to improved margins and reduced costs in the long run," *id.*; and (3) the statements in the July 21, 2004 press release and earnings call reiterating financial guidance for fiscal year 2004 and discussing expectations of further improvement in gross margins in the second half of 2004, *id.* ¶ 121-22, which was discussed above.

Plaintiffs alternatively argue that even if the statements are considered forward-looking, there was insufficient meaningful cautionary language accompanying the statements.  Plaintiffs contend that the language is inadequate because defendants already knew of but failed to disclose

---

[8]     Plaintiffs also argue that statements about a company's growth trend are not forward-looking. Pls.' Opp'n at 16:11-13 (citing *Ronconi*, 253 F.3d at 430-31).  However, the court concludes that the statements identified by defendants are statements of expected financial performance, not statements about the company's growth trend.

United States District Court
For the Northern District of California

the impact of competition from the PowerTouch and the distribution problems. Alternatively, plaintiffs submit that because the defendants' knowledge is at issue, whether the safe harbor applies is a question of fact not suitable for determination on the pleadings. To fall within the safe harbor, a statement must not only be forward-looking, but also accompanied by meaningful cautionary language. § 78u-5(A)(i). This requires that the cautionary language "relate directly to that to which plaintiffs claim to have been misled." *In re Worlds of Wonder*, 35 F.3d 1407, 1415 (9th Cir. 1994) (quoting *Kline v. First W. Gov't Sec., Inc.*, 24 F.3d 480, 489 (3d Cir. 1994)). Where the challenged statement is a forward-looking statement, the plaintiff must plead that the defendant had actual knowledge that the statement was false or misleading. *In re Daou Sys.*, 411 F.3d at 1021 (citations and quotations omitted); *Ronconi*, 253 F.3d at 429; *see also* 15 U.S.C. § 78u-5(c)(1).

Here, LeapFrog identified in the particular press releases and earnings calls cited by plaintiffs that management's statements about, *inter alia*, expectations and anticipated financial performance were forward-looking. *See, e.g.*, Turbow Decl., Ex. 1 at 1, Ex. 7 at 3, Ex. 8 at 2, Ex. 10 at 2. LeapFrog further disclosed that specific cautionary statements (or cautionary statements incorporated by reference) explaining the risks associated with the subject matter of plaintiffs' claims in, *inter alia*, its "Risk Factors" section of its forms 10-K and 10-Q. This suffices as meaningful cautionary language of the risks attendant to specific types of problems relevant to LeapFrog. The cautionary language specifically addresses the risks of not meeting tight shipping schedules and therefore losing or delaying sales, the increasing competition with companies like Mattel, the continuing significant challenges presented by the upgrade and implementation of new operational software systems including the supply-chain management systems. Accordingly, defendants' forward-looking statements fall within the safe harbor.[9]

Moreover, plaintiffs' allegations do not set forth why particular statements made were made with actual knowledge of falsity. Even assuming defendants knew the extent to which the

---

[9] Plaintiffs also do not address that LeapFrog's SEC filings disclosed that it was facing increased competition, particularly from Mattel, Inc. The filings explained that Mattel had released a product called "PowerTouch," which had "functional similarity to that of our LeapPad platform." Turbow Decl., Ex. 2 at 20. LeapFrog noted that its business sector was very competitive, and that it could not "assure you that we will be able to compete effectively in our markets." *Id.*; *see also* Exs. 3 at 21; 14 at 11-12; 15 at 19; 16 at 26.

PowerTouch was competing with the LeapPad and knew of the various distribution problems prior to any of these statements, there are no allegations that the purported competition or distribution problems would render any of the specific predictive statements false when made. For example, plaintiffs assert that Bender later admitted that "[o]nce the PowerTouch was introduced . . . we immediately saw a depress in our sales" and, therefore, defendants knew immediately that the PowerTouch "was severely impacting . . . sales growth and would not likely benefit [LeapFrog]."[10] SAC ¶¶ 19, 30. However, the allegations do not show how this statement meant that the financial guidance as to future expected sales, including the downward revisions, were false when made.[11] Notably, although plaintiffs assert that defendants received "daily sales figure reports" and had daily morning telephone conferences advising them of actual sales figures, plaintiffs do not allege that defendants' publicly disclosed financial estimates differed materially from the sales information defendants had access to. Plaintiffs also assert that defendants' knew their forecasts would not be met because the company decided to bundle two (free) books with each LeapPad sale in face of competition from the PowerTouch resulting in lost sales of 2.8 - 2.9 million books. *Id.* ¶ 21. However, plaintiffs make no allegation as to when these lost book sales occurred, that defendants knew of such lost sales at the time the financial forecasts were made but did not take such anticipated lost sales into account in their forecasts. Similarly, plaintiffs do not allege any facts showing that defendants' statement that investments in a new supply-chain operations system would result in reduced costs and improvements in gross margin in the long-run was false when made, or that defendants had knowledge of such purported falsity when the statement was made.

Plaintiffs further contend that where, as here, defendants' knowledge is at issue, dismissal on

---

[10] Plaintiffs also allege that defendants had actual knowledge because 450,000 LeapPad sales were lost between July 10, 2003 and October 3, 2003. *See* SAC ¶ 20. However, according to the complaint, this assertion is made on the basis of "Mattel counsel Hutchins' argument as to pre-damages period units sold" during LeapFrog's patent infringement suit against Mattel. The court does not consider this to be a well-pleaded fact as to defendants' knowledge of lost LeapPad sales due to competition from the PowerTouch during that period.

[11] Defendants might have been able to speculate about the impact of PowerTouch at that time, but speculation would be insufficient to sustain a finding of actual knowledge of falsity. Contextually, the statement referred to the second half of 2003. It is not reasonably disputed that the shortfall of Q3'03 sales compared to forecast sales was due to LeapFrog's inability to ship some of the orders received late in the quarter. It was undisputed that sales for the second half of 2003 exceeded sales for the same period in the prior year.

the pleadings is inappropriate. The court disagrees. While plaintiffs claim they have met the required pleading standard, they have failed to plead facts from which a reasonable person would draw a cogent inference of scienter at least as compelling as any opposing inference one could draw from the facts alleged. Therefore, dismissal at the pleading state is appropriate.

**2. Risk Factors**

Plaintiffs also allege that certain of LeapFrog's disclosures of "Risk Factors" in its quarterly and annual filings with the SEC are false and misleading. As this court held in the July 31, 2006 Order, these statements constitute defendants' cautionary statements and are not actionable to the extent plaintiffs contend defendants should have stated that the adverse factors "are" affecting financial results rather than "may" affect financial results. *See* July 31, 2006 Order at 3 n.2 (citing *Zeid v. Kimberley*, 930 F. Supp. 431, 437 (N.D. Cal. 1996) (Williams, J.); *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 832 (C.D. Cal. 1998)); *see also In re Foundry Networks, Inc.*, 2003 WL 23211577, *10 (N.D. Cal. 2003) (Chesney, J.).[12, 13] Plaintiffs again argue that defendants' risk factor disclosures "amounted to unremarkable hypothetical" statements and were couched as "mere possibilities" rather than "current and past actualities." Plaintiffs further request the court to reconsider its prior ruling because "the securities regulations specifically provide that it is unlawful to 'make *any untrue statement* of a material fact.'" Pls.' Opp'n at 24 n.13 (emphasis in original) (citing 17 C.F.R. § 240.10b-5). Plaintiffs did not seek reconsideration of the court's July 31, 2006 Order other than its *ex parte* request in a footnote in its opposing brief. In any event, as the court

---

[12] Plaintiffs cite *In re Leadis Tech., Inc. Sec. Litig.*, 2006 WL 496039, *4 (N.D. Cal. Mar. 1, 2006) (Breyer, J.), for the proposition that risk factors are actionable under § 10(b). However, in *In re Leadis*, the court merely concluded that plaintiffs' allegations that certain risk factor disclosures violated Section 11 of the Securities Act were subject to the heightened pleading requirements not usually applicable to Section 11 claims because they essentially allege fraud.

[13] In addition, plaintiffs' citation to a pre-PSLRA Fifth Circuit case that addressed an action under Section 11 of the Securities Act does not support their contentions. *See Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981) (finding that the warning in the prospectus that "THESE SECURITIES INVOLVE A HIGH DEGREE OF RISK" was insufficient) (*aff'd in part and rev'd in part on other grounds by Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983)). Plaintiffs also cite to *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400-01 (S.D.N.Y. 2005) for support. However, the court is not persuaded. *In re Van der Moolen* adopted with little reasoning the *Huddleston* court's ruling with respect to a disclosure in a Securities Act filing in its analysis under § 10(b). As noted, *Huddleston* is a pre-PSLRA case and involved a § 11 claim that does not require a showing of scienter. Plaintiffs' claims are made under § 10(b).

noted in the July 31, 2006 Order, plaintiffs' allegations do not support that the risk factors themselves are false. For example, plaintiffs' allegations do not show that the risk factor disclosures that "[i]f we are unable to compete effectively with existing or new competitors, our sales and market share could decline" and "[o]verall sales would suffer if sales of LeapPad platforms and books declined," SAC ¶¶ 25, 35, are affirmative false or misleading statements when made.

**3. General Statements of Optimism**

Defendants argue that certain of the statements which plaintiffs argue violate § 10(b) are not actionable because "they are mere vague and amorphous statements of general corporate optimism." Defs.' Mot. at 7:18-20. In *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 868 (N.D. Cal. 2004) (Walker, J.), the court reasoned that such vague and amorphous statements typically are not actionable under § 10(b) because "they are considered immaterial and discounted by the market" and "reasonable investors do not consider 'soft' statements or loose predictions important in making investment decisions." (citing *Wenger v. Lumysis, Inc.*, 2 F. Supp. 2d 1231, 1245 (N.D. Cal. 1998) (Whyte, J.)). There, the court found that statements such as "business remained strong" and "consolidation in the DSL market would be very positive for [Copper Mountain]" are "vague and constitute run-of-the-mill corporate optimism on which no reasonable investor would rely." *Id.* at 868-69.

Similarly, in *In re Netflix, Inc. Sec. Litig.*, 2005 WL 1562858, *7 (N.D. Cal. 2005) (Smith, J.), the court concluded that the defendant's statement that "[o]ur quarter was stellar for one reason, consumers love our service . . . The better our service becomes, the more profitable and faster growing our company becomes" was a vague and amorphous statement that did not give rise to liability for securities fraud. The court also noted that plaintiffs' allegations that defendant knew of customer complaints about its service failed to render the statement false as the existence of problems and difficulties in the daily work of business people "does not make a lie out of any of the alleged false statements." *Id.* (citing *Ronconi*, 253 F.3d at 434). In *Wenger*, 2 F. Supp. 2d at 1245, the court similarly concluded that certain alleged statements did not give rise to a securities fraud claim. For example, the following statements were held to be vague and amorphous: (1) "Fundamentally, we're just a good company, we know our markets very well, we dominate these

**United States District Court**
For the Northern District of California

markets, we have good people, a good management team, and we're positioned to move forward now," and (2) "We were able to perform two successful acquisitions last year." *Id.*

Here, defendants argue that the following statements are similarly vague and amorphous: (1) "This is going to be a very big second half for us," SAC ¶ 29; (2) "Our underlying sell-through at the retail level remained very strong throughout the third quarter," *id.* ¶ 32; (3) "consumer demand for our learning products is more vibrant than ever," *id.* ¶ 42; (4) "we feel very positive," "we all feel good," "we continue to make strong growth in supply chain," and "there's no boogie man out there," *id.* ¶ 72; (5) we are "a financially disciplined company," *id.* ¶ 78; (6) "We are also strengthening our operations group, supply-chain management system and warehousing and logistics functions," *id.* ¶ 99; and (7) "We are pleased with our progress . . . we are prepared for the second half of 2004," *id.* ¶¶ 121-22. Plaintiffs argue that these statements are nevertheless actionable because defendants "failed to disclose or misrepresented the impact of Mattel's competition" and "fail[ed] to disclose implementation delays and severe difficulties, which rendered the statements completely untrue or misleading." Pls.' Opp'n at 30:12-17. With the exception of the statement "[o]ur underlying sell-through at the retail level remained very strong throughout the third quarter," the court concludes that these statements are soft statements or loose predictions that do not give rise to a securities fraud claim. As to the statement regarding underlying sell-through for the third quarter of 2003, which was allegedly made in an October 31, 2003 press release, plaintiffs have failed to allege facts supporting a showing that this statement was false when made. Plaintiffs assert, without factual basis, that the shortfall for the third quarter was not due to timing of orders between the third and fourth quarters of 2003. SAC ¶ 34. Plaintiffs' contention that defendant Bender later testified that "we immediately saw a depress in our sales" once the PowerTouch was introduced (on July 24, 2003) is not sufficient to raise a strong inference of falsity that sell-through throughout the third quarter remained strong.[14]

The court does not find plaintiffs' arguments persuasive or the cases cited by plaintiffs to be

---

[14] Notably, plaintiffs had previously alleged that defendants missed its third quarter 2003 forecast because it was unable to ship a $12-$13 million Toys 'R Us order at the end of the third quarter. *See* July 31, 2006 Order at 4 n.3 (referring to allegations in plaintiffs' First Amended Complaint); *see also* SAC ¶ 61.

United States District Court
For the Northern District of California

applicable to this issue. Contrary to plaintiffs' argument, the court in *No. 84 Employer-Teamster Jt. Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003), did not hold that a statement that "'bright revenue prospects' were ahead" constituted a statement that could give rise to liability for securities fraud. In *America West*, the alleged statement was enumerated by the court in the factual background section of its opinion as one of numerous alleged statements. The court later held that the plaintiffs had "sufficiently pleaded the materiality of America West's misrepresentations regarding its maintenance issues, the FAA investigation, and the FAA settlement agreement" even though the market did not react to the disclosures of fines and penalties later imposed by the FAA. *Id.* at 934-35. Relying upon a Western District of Washington case, plaintiffs argue that only statements "on the extreme edge of generality and vagueness" may be insufficient for a securities fraud claim. *Id.* at 29:18-20 (citing *South Ferry*, 399 F. Supp. 2d at 1129).[15] However, while the court in *South Ferry*, 399 F. Supp. 2d at 1129, held that statements on the "extreme edge of generality and vagueness" may be inactionable, it did not purport to set a minimum threshold for such statements. Rather, it concluded that because the allegedly vague and amorphous statements "are either immediately preceded or followed by very specific statements of fact that supposedly justify or supply a foundation for the optimism," the statements were actionable. *Id.* at 1130.

**4. Statements by Analysts**

Defendants argue that the analyst statements relied upon by plaintiffs to assert securities fraud are not sufficiently pled. *See* SAC ¶¶ 27, 29, 76, 89, 91, 125, 128. Plaintiffs argue that liability exists even if the analysts' report does not consist of exact quotations; rather, that the statements were made by the analyst after meeting with defendants suffices. Pls.' Opp'n at 31:20-26. Further, plaintiffs contend that whether an allegation that defendants provided information to securities analysts is true is a question for the trier of fact.

"[W]hen statements in analysts' reports clearly originated from the defendants, and do not represent a third party's projection, interpretation, or impression, the statements may be held to be

---

[15] Plaintiffs also point to *In re 2TheMart.com Sec. Litig.*, 114 F. Supp. 2d 955, 961 (C.D. Cal. 2000) for the proposition that some statements of expectation and belief are actionable. However, the rule stated in *In re 2TheMart.com* applies only to forward-looking statements, addressed in Section III.C.1, *infra*, of this order.

actionable even if they are not exact quotations." *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1235 (9th Cir. 2004). However, "where third parties make such forecasts, defendants are not liable unless they 'put their imprimatur' on the projections." *Id.* (citations omitted). In *Oracle*, the court concluded that the analysts statements were actionable against defendants because they clearly originated from Oracle and were merely reported by the analysts to the public. *Id.* For example, an analyst reported that "Oracle sees robust demand for both its database and applications business. Specifically, Sanderson noted demand for ERP is surprisingly robust while advanced planning and scheduling, CRM, and SCM products are also doing well." *Id.* at 1234. Oracle conceded that these statements were simply repeats of statements it had directly made elsewhere. *Id.* The court distinguished the situation from *Wenger*, 2 F. Supp. 2d at 1246, where the alleged statements were "repackag[ing of] defendants' actual oral statements in vague and impressionistic terms" by analysts. *Id.*

Here, the analyst statements alleged by plaintiffs are more akin to the statements in *Wenger* where the analyst "repackaged" defendants' statements in "vague and impressionistic terms" rather than the mere reporting of defendants' actual statements as in *Oracle*. For example, plaintiffs allege that the Bear Stearns analyst stated, *inter alia*, "[o]ur recent meetings with management of LeapFrog enhanced our conviction that the second half of the year will be a blow out and the company's long-term prospects remain bright," (2) "sales momentum remains strong," (3) "[m]anagement was nonchalant over Mattel's launch of its competing product," and (4) "management also believe[s] [Mattel's PowerTouch] could have a positive impact. Mattel's marketing spend will surely elevate consumer awareness and potentially draw buyers into stores which could, in fact, stir sales of the LeapPad or other LeapFrog products which tend to show better at retail." SAC ¶ 27. None of these statements appears to be a repeat of what management actually said to the Bear Stearns analyst, nor do plaintiffs so allege. Finally, although factual allegations that defendants provided information to analysts may present an issue for the trier of fact, plaintiffs do not allege facts supporting a showing that defendants provided the specific information relayed by the analysts. Plaintiffs only assert that is the case in a conclusory manner.

United States District Court
For the Northern District of California

**D. Allegations of Insider Sales of Stock**

Under the PSLRA allegations of insider sales of stock may give rise to an inference of scienter. However, plaintiffs make no attempt to plead how the timing of any specific sale by any specific defendant is linked to intentional misrepresentations or omissions or gives rise to an inference of scienter as to specific misstatements or omissions. Plaintiffs' generalized allegations that defendants sold shares between July 24, 2003 and October 21, 2003 when they knew that shipping problems and competition with PowerTouch caused sales to decline and between October 22, 2003 and February 10, 2004 when they knew of these same problems and had also drastically reduced prices are inadequate.[16] SAC ¶ 12. Although plaintiffs point to Wood's sale of approximately 2.7 million shares in September 2004, the sale occurred after Wood was demoted to Chief Vision and Creative Officer in February 2004 (and not alleged to have a role in the direction and control of the business and its officers) and after Wood left LeapFrog. *Id.* ¶¶ 6, 13.

**E. Section 20(a) Claim**

To prevail on their section 20(a) claim, plaintiffs must adequately allege a primary violation under their section 10(b) and Rule 10b-5 claim. *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15. Because the court finds that plaintiffs have failed to state a section 10(b) and Rule 10b-5 claim, plaintiffs' section 20(a) claim necessarily fails.

**F. Leave to Amend**

Defendants argue that plaintiffs claims should be dismissed with prejudice because plaintiffs have already had several opportunities to amend their complaint but failed to cure the deficiencies. Fed. R. Civ. P. 15(a)'s edict that "leave shall be freely given when justice so requires" is "to be applied with extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (quoting *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001) (citations omitted)). In the absence of any apparent or declared undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of

---

[16] Although not set forth in the allegations, defendants note that nearly all of the individuals' stock sales during the Class Period were pursuant to automatic trades under a pre-planned 10b5-1 plan. *See* Individual Defs.'s Mot. Dismiss at 12:12-14.

amendment, or other reasons, leave should be freely given. *Id.* at 1052. "Adherence to these principles is especially important in the context of the PSLRA." *Id.* Although plaintiffs have failed to cure deficiencies previously identified in the court's order, the court does not at this time conclude that amendment to plaintiffs' allegations of misstatements and omissions to be futile. Therefore, leave to amend shall be granted.

## IV. ORDER

For the foregoing reasons, the court GRANTS defendants' motions to dismiss. Plaintiffs have twenty (20) days from the date of this order to amend their complaint.

DATED: 9/30/07

Ronald M. Whyte

RONALD M. WHYTE
United States District Judge

**United States District Court**
For the Northern District of California

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiffs:**

| | |
|---|---|
| Michael M. Goldberg | info@glancylaw.com |
| Darren J. Check | dcheck@sbclasslaw.com |
| Laurence D. King | lking@kaplanfox.com |
| Linda M. Fong | lfong@kaplanfox.com |
| Patrick J. Coughlin | patc@mwbhl.com |
| Darren J. Robbins | drobbins@mwbhl.com |
| William S. Lerach | billl@mwbhl.com |
| Kimberly C. Epstein | kimcor@mwbhl.com |
| Luke O. Brooks | lukeb@mwbhl.com |

**Counsel for Defendant:**

| | |
|---|---|
| Daniel W. Turbow | dturbow@wsgr.com |
| Kassra Powell Nassiri | knassiri@wsgr.com |

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:** 9/30/07

TSF
**Chambers of Judge Whyte**